SWOOPE *VS* TROTTER.

*As to the pursuit in equity of a trust fund, in the hands of a stranger.*

1. Chancery will pursue and appropriate to its legitimate object, a trust fund, in the hands of a stranger, to whom it has been paid by the trustee in satisfaction of his own debt.
2. Thus, where A, a co-security to a guardianship bond, received from the guardian, in consideration of the private debt of the latter, a portion of his ward's funds, and after the insolvency of the guardian, B, the other surety, was called upon to pay the funds of the ward ;—Chancery (under the facts,) on a bill filed by B, followed up in the hands of A, the amount received by him, and decreed its payment to the satisfaction of his ward's claim.

This was a bill in Chancery, filed in Lawrence Circuit Court, by Jacob K. Swoope against Joseph Trotter.

The bill charged, that on, or about the —— day of October, eighteen hundred and twenty-four, orator and Joseph Trotter became the sureties of one David J. Poore, in a bond, given by the latter as the guardian of William W. and Thomas S. Logwood, infants. That in pursuance of said guardianship, the said Poore took possession of the slaves and other estate of the said wards, being at that time, (unknown to orator,) very greatly embarrassed in his circumstances. That the said Trotter well knew, as orator believed, that the said Poore was embarrassed; and the said Trotter, either individually, or as a member of the firm of Trotter & McGonegal,

then had considerable claims against the said Poore, and became his surety to the said bond, for the purpose of securing himself in said claims, and to enable him to procure a settlement of the same out of the guardianship funds in the hands and possession of the said Poore. That subsequently, the said Poore, having become still more embarrassed, executed a deed of trust, of all his estate, to secure the payment of his debts; that orator and the said Trotter were parties to this deed, and, in common with other creditors, received a dividend; which, on the part of orator and said Trotter, was applied to the payment of a security debt, having no relation to the guardianship bond security, as aforesaid. Orator further charged that, said Poore was deceased, having died insolvent: that after his death, orator and said Trotter took posession of the infants' property, and managed it for their benefit: that the said Poore in his life time, commenced two suits, in the Circuit Court of Limestone, for the benefit of his said wards; on which he recovered judgment. That after the said recovery, the said Trotter procured an order from said Poore, directed to his attorney, directing the latter to pay over to Trotter, the proceeds of the two said judgments to the firm of Trotter & McGonegal, in discharge of the individual debt of the said Poore;—the said Trotter then well knowing that the money so recovered as aforesaid, belonged to, and was part of the estate of the said wards.

Orator charged, that himself and said Trotter had settled with William W. Logwood, one of the said wards; and had paid him, out of their individual funds, the sum of two hundred and ten dollars,

each—so much wasted by the said Poore.  That the
said Thomas S. Logwood was of age, and that ora-
tor and Trotter had estimated the loss they would
sustain, on a settlement, to the sum of twelve hun-
dred and ninety-five dollars.

The bill, therefore, prayed a decree, compelling
said Trotter to pay over, in discharge of the amount
due the ward, the money received by him in dis-
charge of Poore's individual debt, out of the wards'
funds.

Trotter answered, setting out, that he, together
with complainant, did become Poore's sureties, as
aforesaid; and that Poore, in pursuance thereof, took
possession of the wards' estate.  He denied any
knowledge of Poore's insolvency or embarrassment :
stated that at the period referred to in the bill, the
said Poore was indebted to respondent and his part-
ner, McGonegal, in and about two hundred and nine-
ty dollars, not at that time due; that Poore was con-
sidered after that time good for his debts, in as much
as many firms (with which Trotter seemed connect-
ed,) credited him to large amounts, down to the
period of executing said trust deed.  Respondent
disavowed the motive charged, of becoming a surety
to Poore's bond, for the object of securing his pri-
vate debt.  He admitted the ultimate embarrass-
ment of Poore; the execution of the deed of trust;
the recovery of the two judgments; and the pay-
ment, by order on Poore's attorney, of their amounts,
in satisfaction of a debt due by Poore to the firm.
Respondent averred, however, that he was informed
said money was the proceeds of suits in favor of
Poore's brother, for whom he was (as stated by him

to Trotter,) acting as agent; and denied any knowledge that the amount received by him belonged to the wards' funds.

The evidence in the cause consisted of the deposition of John J. Ormond, Esquire, which bore testimony to the following facts: That he did prosecute to recovery, for Poore, as guardian of William and Thomas Logwood, two suits; and that the proceeds, except his fee, were paid to Trotter, as deponent believed, on the verbal direction of Poore: that on his return from the Court, where the cases were pending, he informed Trotter of their recovery, and the amount: that one of the suits was brought against one Moseley, the executor of a previous guardian of Poore's wards; and was founded on a settlement made by the deceased guardian with the Orphans' Court; the other suit, being for the recovery of the hire of negroes, the property of the wards, incurred before Poore became guardian: that Robert Poore was the brother of David, deponent's client, and had been the guardian of the young Logwood's, previous to David's qualification as such: that David wished suits brought in his brother's name, but became guardian, and the suits were commenced in his own; and that Robert Poore had no interest in them. Deponent believed, that Trotter knew the character of the suits; as he was present when deponent received the amount recovered of Mosely—that having recovered double what Poore anticipated, the latter informed Trotter of it: that at the time of the payment by Mosely, the latter fell short about seventy-eight dollars and sixty-five cents; and it was agreed that deponent should receipt in full, and retain the

amount, with interest, out of notes placed in deponent's hands by Mosely, for collection; that this agreement was specified in writing; and that deponent, at the request of Trotter, also agreed to wait for twenty-five dollars of his fee, till the money was collected; which was endorsed by Trotter on the papers. Deponent stated that he had not, to his belief, mentioned the matter to any person; and that the circumstance became, by accident, known to complainant, while settling with Poore's wards.

The chancellor, on a final hearing, dismissed the bill, at complainant's costs; and the complainant took a writ of error.

HITCHCOCK, C. J.—This is a bill in equity, filed by the plaintiff in error, Swoope, against Trotter, as co-security in a guardianship bond for one David J. Poore, as guardian of Wm. W. and Thomas S. Logwood, to compel a contribution; alleging that his co-security had received of their principal, Poore, in payment of the individual debt of Poore to the firm of Trotter & McGonegal, a portion of the trust funds.

The bill charges that Poore, the guardian, while managing the funds of his wards, being considerably indebted to the firm of Trotter & McGonegal, and being much embarrassed, and while prosecuting two suits in the Circuit Court of Limestone county, for the use and benefit of his wards, gave an order, directing his attorney, J. J. Ormond, Esquire, to pay over the proceeds of said judgments, to the firm of Trotter & McGonegal, in discharge of his individual debt due to Trotter & McGonegal; and that said

Trotter well knew, at the time he procured the order, that the said sums belonged to the orphans; and that he also knew of the embarrassments of the said Poore, and that he was unable to pay his debts.— The bill further states, that Poore died insolvent; that the complainant and defendant took the balance of the property of the orphans, and administered it till they became of age; when on a settlement, they had to pay one of them, two hundred and ten dollars each, out of their individual funds, and that the estimated loss to be paid to the other, is one thousand two hundred and ninety-five dollars: that the amount received by Trotter, of the attorney of Poore, on the judgments, is eight hundred and seventy-four dollars and fifty cents, in one case, and one hundred and twenty-one dollars and thirty-four cents, in the other: and prays that he may be compelled to account for that sum, towards making up their loss.

The answer admits, the reception of the order, but denies he knew at the time he received it that Poore was greatly embarrassed, and unable to pay his debts, and also denies that he knew the character of the funds drawn for, to be that of the orphans, as well as he recollects; but alleges, that Poore then informed him, that they were the proceeds of some suits in favor of his (Poore's) brother Robert, for whom Poore alleged he was acting as agent, whom he affirmed he had paid for the claims: that believing that said Poore was entirely responsible in his circumstances, and that he was not abusing any trust whatsoever, he received it: that the order was in a short time, and before said Poore's circumstances were thought to be failing, presented to the drawer,

and accepted. He states, that at the time of the giving of the order, which was in the spring of 1826, Poore was indebted to the firm of Trotter & McGonegal about nine hundred dollars. The answer concludes, by stating, that the first *distinct intimation* that he remembers to have received, of the true character of the fund, was in 1832, when making a settlement with the complainant and William W. Logwood.

The testimony of J. J. Ormond, Esquire, was taken; who states, that he brought the suits for Poore, as guardian of the Logwood's, to March term, 1826, of the Circuit Court of Limestone county, and obtained judgments at September term following; that the largest judgment was paid in January, 1827—the other, some time after; that the proceeds, except his fees, were paid to Trotter; that he has no recollection of any written order from Poore to Trotter—that he has searched diligently his papers, but can not find one, though he has found other papers of less importance; his recollection is, that Poore instructed him verbally to pay the money to Trotter & McGonegal, and that this was in the summer preceding the judgments; that as soon as he returned from Court, he apprised Trotter of the recovery; that he feels *pretty certain* that he informed Trotter of the character of the suits, on his return in September, 1826, from Court; that he had recovered twice as much as Poore supposed was due; that he was quite pleased with his success, and related it to Trotter. That when he received the money from Moseley, on the large judgment, Trotter was present, and he thinks knew the character of the suits; that

4P          5

at the payment of the money, seventy-eight dollars and sixty-five cents were deficient, and that it was agreed that he, the witness, should receipt for the full amount, and take from Moseley an authority to retain that sum, with interest, out of notes he put in witness' hands for collection, and that Mosely gave him a written authority to that effect, and that, at the instance of Trotter, he agreed to wait for twenty-five dollars of his fee out of said collections, which Trotter endorsed on said authority, that he was entitled to do: that the authority, which was in the hand-writing of the witness, except the signature of Moseley, which had been accidentally torn off, was as follows:

"Mr. Ormond will apply the sum of seventy-eight dollars and sixty-five cents, to the discharge of a balance of a judgment, obtained by David J. Poore, *guardian, &c. against me, as executor of Mary Tate, deceased*, out of the proceeds of some notes put into his hands this day for collection.—27th January, 1827."

The endorsement is as follows:

"Mr. Ormond is entitled to twenty-five dollars of the amount mentioned in this order, as payable to D. J. Poore.—27th January, 1827.

"(Signed,)          "Jos. Trotter."

This was all the testimony in the case, and upon the final hearing, the Circuit Court dismissed the bill, with costs.

That Poore committed a breach of trust in directing this disposition of the funds, belonging to his wards, there is no doubt; and the question is, whether the defendant is a party to the breach, so as to make

him liable to account for it, for the benefit of his co-security.

There are many decisions in the Chancery Reports, as to how far creditors, and specific and residuary legatees, may follow the funds of their testators, in the hands of third persons, where executors have diverted the trust funds,—some of them turning upon questions of express—some of them upon implied, frauds, and others where, though no fraud is shown, yet, where such evidence of gross negligence, on the part of those dealing with executors, in not examining as to the character of the fund, is exhibited, as to subject them to liability at the suit of those originally entitled. A very elaborate review of these cases, may be found in the case of *Hill* vs *Simpson,* [* 7 Vesey, 152.] by Sir William Grant, Master of the Rolls; and again, in the case of *McLeod* vs *Drummond;* [† 14 ib. 353] from which an appeal was taken to the Lord Chancellor, and which is to be found in 17 *Vesey,* 153.

These cases shew, that though the power of an executor over the property he takes from his testator, is very large, both in Law and Equity—both to enable him to execute his trust, and also to prevent the general inconvenience of implicating and entangling third persons, in inquiries as to the application of the assets;—yet, that wherever there is a fraud, or direct evidence that the executor is going to misapply the funds, or is not acting in the execution of his duty; or where, from the transaction, the circumstances attending it should have put the party upon enquiry, as to the nature of the fund disposed of, a Court of Chancery will entertain jurisdiction, and restore it to its legitimate purpose.

These decisions are considered applicable to the case of guardians, and those dealing with them.—They can not be more favorably viewed than executors; as they are not invested with any thing like the same authority that belongs to them.

In the case before the Court, the answer denies all knowledge of the character of the funds, either at the time of the giving of the order, or at the receipt of the money, *so far as the defendant recollects*; but states, that at the reception of the order, Poore, the guardian, informed him that the suits were in favor of his brother Robert; that he was acting as his (Robert's) agent, and that he had paid Robert the amount of the claims. He also states, that at the date of the order, he believed Poore to be solvent. He admits, however, that before the payment of the money, Poore became notoriously insolvent. He knew that Poore was the guardian of the Logwood's, and was negotiating for security for a precedent debt. Under this aspect of the case, did not the circumstances require him to make some enquiry as to the character of the fund? It was not money that he received; neither was it a claim professedly in the name of Poore, reduced to a judgment; but a claim acknowledged to be then in suit, in the name of another person, of whom Poore was the agent, and no evidence produced, either of the agency, or of the pretended payment to the principal. Ordinary diligence, it would seem, in such a case, would have directed the defendant to have examined into the nature of these suits. But before the amount of these suits were realized, the insolvency of Poore became apparent: he assigned all his property to trustees,

for the benefit of his creditors, among whom was the defendant, and his partner, McGonegal. Here, again, was matter for enquiry. Had the defendant gone to the records, he would have at once seen the nature of these suits, and that they were the property of the wards of Poore; and under these circumstances, had he a right to shut his eyes and his ears, and to repose upon his order? If he chose to do so, must he not abide by the consequences?

In a case where a banker received transfers, from time to time, and an executor making advances for his account—part of the funds deposited were those of the executor, and part were a trust fund, the defendants denied that they knew, or suspected at the time of the transfers, that the property was not that of the transferee; that he represented to them that he was absolutely entitled thereto, subject only to a small annuity, &c.—the Master of the Rolls remarks—that "common prudence required that they should look at the will, and not to take the debtor's word, as to his right under it. If they neglect that, and take the chance of his speaking the truth, they must incur the hazard of his falsehood. The rights of third persons must not be affected by his negligence. I do not impute to them direct fraud; but they acted rashly, incautiously, and without the common attention used in the ordinary course of business."[*] If the case rested upon this point, I should have little difficulty in reversing this decree.

[* 7 Vesey, 170.]

But the testimony of Mr. Ormond, places the point of notice, before, and at the time of payment, beyond question. The answer is negative as to his recollection: he may have forgotten; but the testi-

mony of Mr. Ormond is affirmative; and though couched in such language, as to his belief, as is quite material when a person is testifying to a transaction of long standing, yet not so as to imply a doubt as to the point of the fact having been communicated. Mr. Ormond expresses no doubt, and he refers to circumstances before and at the time of payment, that carry conviction, as to his correctness.—He knew of the interest of Trotter in the suits—had been successful beyond his expectations—was pleased with his success;—it was natural, therefore, that he should communicate it to the person most interested; and he says he thinks he did. In addition to this, the order and endorsement given at the time of the payment, have the double effect of confirming the testimony of Mr. Ormond, as to his recollection, and also of an independent fact, which brings the knowledge of the character of the suits home to the defendant: these speak of the suit being in the name of *Poore, as guardian.* This, taken with the evidence of Mr. Ormond, present a case, in which the contradictory testimony of one credible witness, accompanied with strong circumstances, destroy the weight of the answer of the defendant.

The testimony of Moseley, who was present, is not taken. It was not necessary to sustain the bill; and as the defendant has not taken it, it is to be presumed that it could do him no good.

We do not impute either express or implied fraud in the defendant, in this case; or perjury in his answer. Relying, no doubt, on the legal efficiency of the order—the facts stated by the witness not being expressly charged in the bill, and the time which

had elapsed from the date of the transaction, and the filing of the bill—the facts, in detail, may naturally have escaped his recollection. This does not, however, authorise us to recede from the known rules of law and evidence.

The counsel for the defendant, in the written argument furnished, to avoid the effects of the testimony of Mr. Ormond, contends, that the right to the money became complete, at the time the order was given, and that he can not be affected by his subsequent knowledge of the truth of the case. If this were so, it does not relieve him from the first view we have taken of the case, but would charge him directly with a knowledge of the character of the suits, as in that case he would be considered as having received a transfer or assignment of the suits. But we think, that until the actual receipt of the money, the defendant is chargeable with all such facts as may tend to bring to his knowledge the true state of the case. It was, at most, a pledge for a precedent debt. Until then, his right can not be considered as complete, and until then, may be defeated.

In the foregoing view we have taken, we have considered the case as if the wards were pursuing their rights against a stranger, who had improperly obtained their effects from their guardian. The peculiar situation of the complainant and defendant, we think authorises the complainant to come into Equity now to assert his rights. They are co-securities—their principal is insolvent, and they are directly liable to the wards. One of the co-securities illegally withholds a portion of the trust funds:—a part of the loss has already been paid by the securi-

ties, and it is not necessary that the complainant should first be compelled to pay the balance to the wards before he can compel the co-security to account. It does not stand upon the footing of a co-security who has paid more than his proportion. The breach of trust on the part of the guardian, gives the Court of Chancery jurisdiction *to follow* the trust fund, and direct its proper application.

The decree, dismissing the bill, is reversed, with costs; and a proper decree must be rendered in this Court.