# Van Hoose, Trustee, *et al. v.* Bush *et al.*

## *Bill in Equity to enforce Vendor's Lien, &c.*

1. *Constitutional law.*—It is within legislative competency, by a special act, to remove the administration of an estate from the probate court of the county where the decedent resided and letters were granted, to the probate court of another county.

2. *Same.*—Under the special act authorizing the removal of the administration of the estate of Nancy Thompson from the court of probate of Tuscaloosa, to that of the court of probate of Greene county, the jurisdiction of the former court ceased on the final settlement and resignation of the administrator, and the jurisdiction of the probate court of Greene could be invoked; and, properly invoked, its jurisdiction became as full and complete as if the intestate had died in that county and the court had originally taken jurisdiction of the cause.

3. *Title of heir to land sold under order of probate court; when divested.*— Where lands are sold under order of the probate court, the title of the heirs is not divested, until the court, on report of payment of the purchase money, orders a conveyance to the purchaser, and it is duly executed.

4. *Confederate treasury notes ; when use of not illegal.*—While the issue of Confederate treasury notes was unlawful and in violation of the Constitution of the United States, their use in the ordinary transactions of civilized society, was not illegal ; it was unlawful, only where the intent existed, and the direct and immediate effect of such use was, to aid in promoting and encouraging hostilities against the United States.

5. *Administrator or executor ; title of, to personal assets of deceased.*—The executor or administrator has the full legal title to the personal assets of the deceased, including choses in action, and, except so far as restrained by statute, has the power of disposition over them.

6. *Same.*—He may not only give acquittances, but may compromise, transfer, or assign such assets; and although if he does so improperly, he is answerable as for a *devastavit*, the rights of those dealing with him, to whom no fraud or bad faith is imputable, will not be affected or impaired thereby.

7. *Same; what necessary to show concurrence in devastavit.*—Although an executor or administrator acts in bad faith, mere knowledge that he is dealing with trust assets, raises no presumption, or casts any suspicion against his disposition of them to those dealing with him within the line of his authority and duty; before they can be charged with concurrence or participation in his *devastavit*, they must have knowledge of his want of good faith, and must intend, or be reckless of the consequent injury to the *cestui que trust.*

APPEAL from Chancery Court of Tuscaloosa.

Heard before Hon. A. W. DILLARD.

This bill was filed by the heirs at law of Nancy Thompson, by next friend, Bush, against Edward Rencher, formerly administrator of her estate, A. R. Davis, administrator *de bonis non*, and the sureties upon his official bond, James W. Baird and W. F. Karsner, praying an account and settlement of Davis' administration, and for a decree against his sureties, and

discovery, &c.; and also to declare and enforce a vendor's lien on certain lots in the city of Tuscaloosa, formerly belonging to said estate, which had been sold under order of the probate court, the purchase money of which, complainants alleged, had never been paid, and for general relief. Afterwards Virginia Baird, and J. M. Van Hoose, her trustee, who were in possession of the lots, were made defendants. There were several demurrers put in, which need not be further noticed. The cause was submitted on bill, answers and testimony, and a decree rendered, (which, among other orders, not necessary to be noticed, in the view the court took of the case), declared that the lots were subject to the vendor's lien for the unpaid purchase money; that the payment made by the original purchaser, Reese, in Confederate money, was not a valid payment; that the report of the administrator *de bonis non*, showing payment in such funds, was notice to purchasers from Reese, that payment was made in that currency, and, therefore, valueless; and that the lands in their hands were liable for the unpaid purchase money; wherefore a sale was ordered.

The material facts of the case are as follows: Nancy Thompson died intestate in Tuscaloosa county, seized and possessed of lands, slaves and other personal property, leaving complainants her only heirs at law and distributees. On the 16th day of July, 1857, the probate court of that county granted letters of administration to Rencher, who sold the personalty, and paid all the debts. On the 9th day of November, of the same year, under order of the probate court, he sold the realty for division, on a credit of one, two, and three years, and Reese became the purchaser of the lots in controversy, and gave his notes for the purchase money, in accordance with the terms of the sale, which was duly reported to and confirmed by the court.

On the 4th of November, 1862, Rencher, who had previously filed his accounts and vouchers, made a final settlement of the estate in the probate court of Tuscaloosa, and resigned. On this settlement, a decree was rendered against him for about five hundred dollars. On the 18th day of November, 1862, the legislature passed an act, which was approved the same day, entitled, "An act to remove the estate of Nancy M. Thompson, deceased, from Tuscaloosa to Greene county." This acts reads as follows:

SEC. 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama, in General Assembly convened,* That at any time after the resignation and final settlement of Edward Rencher as administrator of Nancy M. Thmpson, in

the probate court of Tuscaloosa county, it shall be lawful for the probate judge of Greene county to grant administration upon said estate remaining unadministered, and to take full jurisdiction over said unadministered estate, and make all orders and decrees in respect thereto, as if said judge of Greene county had had original jurisdiction over the same; and it shall be lawful for the administrator of said estate, appointed by the probate judge of Greene county, to remove the slaves and other personal property belonging to said estate, from Tuscaloosa county to Greene county.

Sec. 2. *Be it further enacted,* That after the resignation, settlement, and appointment mentioned in the first section of this act, it shall be the duty of the probate; judge of Tuscaloosa county to transfer to the probate court of Greene county all the original papers on file in his office relating to said estate, together with copies of all orders and decrees in respect thereto, duly certified under his hand and the seal of the court.

Approved, November 18, 1862.

Afterwards, the facts being made to appear to the probate court of Greene county, by proper evidence, that court appointed Davis, general administrator of the county, administrator *de bonis non* of the estate. On the 14th day of December, 1863, Davis reported to the court that the purchase money for said lots had been paid by Reese, on the 8th day of October, of that year, in "Confederate treasury notes," and prayed an order to make conveyance, &c. The court, in a decree reciting that the purchase money had been paid in full, but which was silent as to the kind of money in which payment had been made, directed Davis, as administrator *de bonis non,* to make conveyance to Reese, which was accordingly done. Reese, on the 24th day of December, 1863, for a valuable consideration, conveyed, by a quit claim deed, to Thomas Lewis, reciting in it that the land was purchased by him, at a sale made under the decree of the probate court of Tuscaloosa county. On the 10th of June, 1864, Lewis by deed, with the usual covenants as to being seized of an indefeasible estate and for warranty, &c., conveyed, for a valuable consideration, to J. W. Baird. The latter, in Februrary, 1869, in consideration of natural love and affection for his wife, conveyed the lots to Van Hoose, in trust for her.

Complainants aver "that the purchasers from Reese are charged with notice that the purchase money was paid in Confederate money, which was an unconstitutional currency, and not a lawful consideration for a conveyance, or, if it was, yet a grossly inadequate consideration, and was a col-

[Van Hoose, Trustee, et el. v. Bush et al.]

lusion between Reese, the purchaser, and Davis, the fiduci-
ary." There was no evidence, however, which impugned the
*bona fides* of the payment in Confederate treasury notes.

The complainants also averred that they were minors at
the time of the acceptance of this money, and did not know
of, and have not since ratified or assented to it, or received
any benefit therefrom, and that Baird, being a citizen of
Tuscaloosa, where the real estate sold was situate, from the
year 1862 up to 1867, and dealing with such real estate, is
charged with notice of the whole proceedings upon which
his title rests, and is not a purchaser for value without notice
of complainant's rights and equities, and that the legal title
had never passed out, of them under the aforesaid orders of
court, and conveyances made thereunder. The validity of
the special act transferring the administration from Tusca-
loosa probate court to that of Greene county, was assailed
by some of the sureties of Davis, who denied any liability
for his acts under appointment of the latter court, which, it
is averred, are void.

J. W. Baird, Virginia Baird, and Van Hoose, trustee, alone
appealed, and on affidavit that the other defendants refused
to unite in the appeal, a summons was issued, and afterwards
a severance granted.

The decree, holding that the purchase money of the lands
was unpaid, and subjecting them in the hands of appellants
to a vendor's lien, &c., is now assigned as error.

VAN HOOSE & POWELL, for appellants.—There is no evi-
dence that Reese did not act in good faith. Appellants are
not, therefore, concerned in the kind of funds Reese paid, if
it be admitted they have no greater rights than he.—3 Johns.
Ch. 147; Sugden on Vendors, 274. The special act of the
legislature was valid.—17 Wall. 570; *Riddle v. Hill*, 50 Ala.;
*Parks, Brewer & Co. v. Coffey*, 52 Ala. These cases, taken
in connection with *Key v. Jones*, 52 Ala., show conclusively
that the payment in Confederate money was valid. The or-
der to convey title, reciting payment of purchase money,
when title was conveyed, divested the heirs of title. A pur-
chaser may be bound to see that the court ordering a con-
veyance has jurisdiction, but that having attached, and the
order to make conveyance being perfect and valid on its face,
he is not bound to search all the records in the case, to see
if the administrator has performed his duties. The pur-
chaser is bound only by what appears on the face of his
deeds.—42 Ala. 618; 18 Ala. 741.

SNEDECOR & COCKRELL, *contra.*—The special act was void.

It was not due process of law. The probate court of Tusca-loosa having jurisdiction, the legislature could not, by a special act, divest that jurisdiction and order a transfer to another court. The report shows a payment in "Confederate treasury notes." It was a proceeding upon which rests the order to convey, and the purchaser, who must ascertain at his peril, whether an order to convey has been made, is bound also, where the record shows what the report was, to see that the report presented a state of facts which author-ized a conveyance to be decreed. No law of Alabama made these treasury notes money. The report, although purport-ing to show payment, in fact and law showed, on the contrary, that payment had *not* been made. The currency was unlaw-ful and formed no legal consideration, and a trustee or agent has no authority to take "depreciated currency" in payment of a debt.—12 Ala. 340; *Chapman, Lyon & Noyes v. Cowles*, 41 Ala. 406. He therefore committed a *devastavit*.

BRICKELL, C. J.—The special act of the General As-sembly (Pamph. Acts, 1862, 170) authorizing the removal of the administration of the estate of Nancy M. Thompson from the court of probate of the county of Tuscaloosa, to the court of probate of Greene county, was a valid, consti-tutional enactment. Each court was of the same constitu-tional jurisdiction. The limitations on this jurisdiction as to the territorial limits, and the cases within which it may be exercised, are of legislative creation, capable of change, enlargement or diminution at the will of the legislature. The legislature alone can exercise the power of removing or transferring administrations from one court of probate to another. Though the interest and necessities of those hav-ing rights in the estate, and its administration, may demand the removal, it does not lie within the jurisdiction of any court to order and adjudge it. The whole matter rests ex-clusively within the power of the legislature.— *Wright v. Ware*, 50 Ala. 549 ; *Coltart v. Allen*, 40 Ala. 155.

When the administrator in chief made the final settlement of his administration in the court of probate of Tuscaloosa, and resigned, the jurisdiction of that court over the estate and its administration, was exhausted by the force of the special statute, and the jurisdiction of the court of probate of Greene could be invoked. The transcript of the record of the final settlement in the court of probate of Tuscaloosa, having been filed in the latter court, its jurisdiction attached, and was as full and complete as if the intestate at her death had been a resident citizen of Greene, and the court had originally taken jurisdiction of the estate and its administra-

tion. The administration being vacant in consequence of the resignation of the administrator in chief, of necessity the first step to be taken, was the appointment of an administrator *de bonis non.* The appointment was made, and thereby Davis, the administrator *de bonis non,* became clothed with the legal title to the unadministered assets. The notes of Reese for the purchase money of the lands, payable to the administrator in chief, being unpaid, were unadministered assets, passing to the administrator *de bonis non,* who alone had authority to sue for, collect or receive payment of them.—*Dunham v. Gant,* 12 Ala. 105.

A purchaser of lands at a sale made under an order of the court of probate, who has fully paid the purchase money, is entitled, as a matter of right, to a conveyance of all the right, title and interest the deceased had in the lands at his death. It is the duty of the court, when the executor or administrator, who has authority to receive payment of such purchase money, reports its payment and makes application to order the execution of such conveyance; or, if the executor or administrator having received payment, neglects or refuses to make the report and application, and the purchaser makes the application and proof of the payment, to order the conveyance. The conveyance may, as the court in its discretion directs, be executed by the executor or administrator, or by a commissioner for that purpose appointed.—R. Code, §§ 2096, 2228. The proceedings for a sale of lands in the probate court, are, in some respects, *in fieri,* until the court orders a conveyance and it is executed. Until such order and conveyance, the title, descending to the heirs or passing to the devisees, if the lands have been devised, is not divested.— *Lightfoot v. Lewis,* 1 Ala. 475 ; *Bonner v. Greenlee,* 6 Ala. 411. The sale can be vacated by the court, and the purchaser divested of all equity, if he fails to pay the purchase money, and judgment has been rendered against him and his sureties, on which execution has been issued and returned "no property found."—R. C. § 3539, p. 671. The jurisdiction of the court is not exhausted until the order for the execution of the conveyance. The order for a conveyance is judicial, in the nature of a decree or judgment, based on facts the court must ascertain and declare. We incline to the opinion, the court having made the order, the fact on which it is based, the payment of the purchase money, is not subsequently disputable. It is finally and conclusively ascertained and declared, and the verity of the record is unimpeachable, except on an application to the court of probate for its vacation, because of fraud. Without determining that question, we are of the opinion the report of the administra-

[Van Hoose, Trustee, et al. v. Bush et al.]

tor *de bonis non* disclosed a valid payment of the purchase money, entitling the purchaser to a conveyance, and compelling the court to order it made.

The payment was made to the administrator *de bonis non*, in Confederate treasury notes, which were accepted by him. The good faith of the purchaser in making the payment is not impugned; nor is any fraud imputed to the administrator. It is urged, the administrator was without authority to receive Confederate treasury notes in payment of the purchase money—that he could receive only gold and silver, or as it is expressed by the chancellor, "lawful money," and consequently was guilty of a *devastavit*, in which the purchaser participated. Whether the administrator committed a *devastavit*, is not the subject of inquiry in the present attitude of this case. The assignments of error refer only to the correctness of the decree, so far as it declares the purchase money unpaid, vacates the conveyance, and for the payment of the purchase money declares a lien on the real estate. As to the purchaser, unless fraud and collusion is traceable to him, the only inquiry is, had the administrator power to accept the payment. If a liability is sought to be fastened on the administrator, other inquiries arise as to his good faith and prudence; and if not wanting in these, as to the use or disposition he made of the notes after having received them.

It is certainly to be accepted as true by all courts, that the establishment and existence of the Confederate government was illegal, violative of the constitution and laws of the United States. The issue of treasury notes by that government to support its existence, was also illegal, contravening the laws and policy of the United States, which it is the paramount duty of courts to maintain and enforce.—*Scheible v. Bacho*, 41 Ala. 437. To this extent the Confederate treasury notes were "illegal and vicious;" *and the use of them to aid in accomplishing the purposes for which they were issued, would be tainted with the illegality of the issue.* These propositions do not, however, reach the material question involved in this and a number of other cases now pending before the court, whether these notes are not a sufficient consideration to support a contract made in the ordinary transaction of business, within this State, while under the actual dominion of the government of the Confederate States? Were they not, when accepted as a payment by one under no disability, and having power to receive, a valid payment, extinguishing and discharging the liability or contract? These are questions the decisions of the supreme court of the United States have fully answered. In *Thorington v. Smith*, 8 Wall. 1, a contract

[Van Hoose, Trustee, et al. v. Bush et al.]

for the purchase of lands, made in this State during the war, the purchase money payable in Confederate treasury notes, was supported, and the party contracting declared bound to pay the value of such notes at the time and place of the contract, in lawful money. The Confederate government is treated as a government of *paramount force,* having temporarily dominion over a part of the territory of the United States. "Obedience to its authority, in civil and local matters," was not only a necessity, but a duty. "Without such obedience, civil order was impossible." It was by this government these notes were issued. They "were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency, imposed on the community by irresistible force." As is said in another case, "the existence of a state of insurrection did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated precisely as in time of peace."— *Horn v. Lockhart,* 17 Wall. 580. The necessity of government, and of civil obedience on the part of all who were under the dominion of the Confederate authority, beyond the protecting power of the constitution, laws and government of the United States, compel courts to consider this currency "as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States." Contracts made for payments in it, or of which it was the consideration, or payments made in it, cannot be pronounced illegal, mere nullities, without manifest injustice, or without pronouncing that civil war annihilated the State, loosened and broke the bond of society, reducing the community to anarchy. It is not a single contract that is to be declared void, nor a single payment set aside. The transactions of millions of people, through a period of four years, are to be disturbed, and uncertainty and insecurity, with the inseparable concomitant, vexatious litigation, introduced and fostered. No matter what was the good faith, and how implicit the confidence marking these transactions, because they may have remotely offended the law, and violated the policy of the government, powerless then to protect these people, or to supply them with a currency, they must be condemned as infected with illegality. No such principle has been sanctioned by that tribunal, within whose province it lies finally to adjudicate the question. Contracts or payment made in Confederate currency in the ordinary course of dealing, and

of transacting business, have no necessary connection with its issue, or with the government issuing it. They may have indirectly and remotely promoted the credit and circulation of the currency, but not being made with the actual intent to maintain the government issuing it, in its unlawful and hostile antagonism to the government of the United States, "they should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation."

In *Delmas v. Ins. Co.*, 14 Wall. 661, the case of *Thorington v. Smith* is reaffirmed, and it is held the notes of the Confederate States, in ordinary use as money, during the war, were a sufficient consideration to support a contract; *and a provision in a constitution of the State, subsequently adopted, declaring such contract was void, was an impairing of the obligation of such contract, within the meaning of the Federal Constitution.*" These decisions were followed and approved by the cases of *Planters' Bank v. Union Bank*, 16 Wall. 483, and "the Confederate note case," 19 Wall. 548. In this court the case of *Riddle v. Hill*, June term, 1874; *Whitfield v. Riddle*, 52 Ala., 467 and several subsequent cases, assert the same doctrine; and, we think, should be regarded as finally and conclusively settling this distressing and vexed question. Confederate treasury notes were illegal because of the character of the government issuing them. The use of them was illegal, when the intent existed, and the direct, immediate effect of the use, was to aid in promoting and encouraging hostilities against the government of the United States. But their use in the ordinary transactions of civil society—in the usual course of individual dealing—in the general transaction of business—was not illegal. It was a necessity, originating, not only in the organization of the Confederate States, the war which was the immediate and inevitable sequence, but also in the want of power to suppress the organization, and to maintain the authority of the government of the United States, so that it could extend protection, and secure to the people residing within the Confederate States, the advantages of government.

Very soon after the organization of the Confederate government, and the commencement of hostilities between that government and the government of the United States, these treasury notes became the only currency, the only circulating medium, within the territory of the Confederate States. Bank notes, the issue of corporations having legal capacity to issue notes capable of circulation as money, and gold and silver coin, into which they were convertible, disappeared, and were rather articles of commerce, bought with and sold

[Van Hoose, Trustee, et al. v. Bush et al.]

for Confederate treasury notes, than money circulating in the community, in which it was expected payments would be made, or on the basis of which contracts were entered into. The conventional laws of trade, of business of all kinds, which have since their introduction treated bank notes as money, and given to them that denomination universally in common parlance, and which now give the "national currency," whether we speak of the issue of national banks, or of the United States treasury notes, that denomination, imparted to Confederate treasury notes the same denomination. For all purposes of commerce, and of transacting ordinary business, they had the uses and qualities of money. As such they were generally received and passed from one to another freely, by the common consent of the community. A payment in these notes was legal, and without regard to their depreciation, if compared with gold and silver, which had ceased to be a standard of value and had become an article of traffic, is as valid as a payment in genuine bank notes.— *Waring v. Lewis*, 53 Ala. 615. In *McPherson v. Gray*, 14 Rich. Eq. 121, a master in chancery, in 1864, received Confederate treasury notes in payment of a bond made in 1859, payable to him, for lands sold under a decree of the court. The payment was made and received in good faith, and extinguished the bond, and it was held, neither the master *nor the makers of the bond were liable to the beneficial owners.* The court say: "These treasury notes were not, as said, even in form, valid promissory notes; but they constituted the whole currency of the country, passed as money, were received by prudent men and paid by the other debtors of McPherson's estate. They were not equivalent to gold and silver, but they supplied the place of gold and silver; they were not in fact compared with specie, for of that there was none; nor were they expected to be immediately convertible into something of universal acceptance, but were sustained in credit by the expectation of their becoming redeemable in future, *and by the sheer necessity which every one felt of their being some acknowledged representation of value.*—(See, also, in same volume, *Wiseman v. Hunter*, p. 167. In *Robinson v. International Life Association Company*, 42 N. Y. 54, (3 Hand), it was held, the payment of Confederate treasury notes to an agent of an insurance company was a good and valid payment of premiums, continuing the policy.—*Rivers v. Moss*, 6 Bush. (Ky.) 600; *Martin v. Horton*, 1 Ib. 624. Neither these notes, nor ordinary bank notes, were or are *money* in its technical sense—coined by the government, and a legal tender in payment of debts. Yet the conventional rules of business, its convenience and necessity, place them on the same footing.

352 SUPREME COURT [Dec. Term,

They are borrowed and lent, paid out and received as money. They are a good tender, if not objected to at the time, and when accepted without reservation they operate a satisfaction equally with gold and silver, whatever may be their depreciation below the value of gold and silver.—*Lowry v. Murrell,* 2 Port. 282; *Scruggs v. Gass,* 8 Verg. 175; *Ware v. Street,* 2 Head. 609; *Bayard v. Shunk,* 1 Watts & Serg. 92.

The power of an administrator to receive Confederate treasury notes in satisfaction of choses in action, was fully considered in *Waring v. Lewis.* A denial of the power is founded in a misconception of his relation, duty, liability and authority. The legal title to all the personal assets of the deceased, including choses in action, vests in administrators or executors. An incident to this legal title, except so far as restrained by positive statute, is the power of disposition. The duty of collecting the choses in action—of reducing them to possession, is coextensive with the title the law casts on him. In the discharge of this duty, and as an incident to his title, he may compound or compromise the choses in action. Though the statutes now authorize the court of probate to confer on an executor or administrator authority to compromise or compound debts owing to or a part of the estate he represents, the power of compromising or compounding conferred by the common law is not thereby taken away. R. C. § 2130-31. Prior to the statute, if he exercised his common law power, and the compromise was impeached, seeking to charge him because of it, on him rested the burthen of proving, to relieve himself from personal liability, that it was judicious and beneficial. There was some peril to the executor or administrator, attending the exercise of the common law power—the necessity of proving in the future his good faith and diligence. To remove this peril, to free him from the difficulty of making proof, whenever his action was assailed, the statute authorizes the court of probate to make an order for a compromise, and this order, when properly obtained and complied with, is an absolute protection to him, foreclosing future dispute. The common law power, however, remains and may be exercised under its attendant risks.—Wyman's Appeal, 13 N. H. 18. Not only may he compromise, but he may transfer or assign the choses in action which are assets in his hands for administration. If he improperly makes the transfer or assignment, thereby he will incur a personal liability for a *devastavit,* but the title of the assignee, to whom no fraud or bad faith is imputable, is not affected or impaired.—*Hough v. Bailey,* 32 Conn. 288; *Walker v. Craig,* 18 Ill. 116; *Wilson v. Doster,* 7 Ired. Eq. 261; *Polk v. Robinson,* Ib. 235. The general proposition that all

who concur with an executor or administrator in a *devastavit*, or participate with a trustee in a breach of trust, are estopped from claiming any advantage therefrom, and are answerable to the *cestui que trusts* for the resulting injury, is admitted. But though an administrator or other trustee may be acting in bad faith, or negligently, and may incur liability for a *devastavit*, those dealing with him in the transaction of ordinary business, within the line of his authority, innocent of any fraudulent intent, will be protected. Before they can be charged with concurrence or participation in his *devastavit* they must have knowledge of his want of good faith, and must intend, or be reckless of the consequent injury to the *cestui que trusts.*— *Walker v. Craig, supra;* Perry on Trusts, § 225. Knowledge that the trustee is dealing with the trust assets—that an executor or administrator is disposing of the debts or choses in action in his hands for administration, raises no presumption nor creates any suspicion against the disposition, whether it is of transfer, or assignment, or payment. The disposition is within the line of his duty and authority, and those who deal with him are answerable for their own, not for *his good faith.* Whoever accepts from an administrator or executor the choses in action of an estate he represents, either as security for or in payment of his individual debt, has full notice of the abuse of his fiduciary power and participates in the *devastavit.*—*Swoope v. Trotter,* 4 Port. 27. But if he receives them as security for money cotemporaneously advanced, or if he purchases them, the transaction is valid.—Perry on Trusts, § 225. The difference is, the one transaction is without, the other within, the scope of power and duty. No interest of the estate could be promoted, no necessity surrounding it, could be relieved by the transfer or pledge of the assets for the payment or security of the debts of the personal representative. The advance of money on a transfer absolute, or conditional, of the choses in action, may conduce to the interests or relieve the necessities of the estate, of which the representative is to judge on the responsibility of his relation. Those who deal with him may rely on the power of disposition with which he is clothed, without inquiry into or being affected by his good faith or prudence.—*Petrie v. Clark,* 11 Serg. & Rawle, 377; *Walker v. Craig, supra; King v. King,* 37 Ga. 205.

Whether the administrator *de bonis non* was guilty of a *devastavit* in accepting from Reese payment of his notes for the lands in Confederate treasury notes, is not now a material inquiry. The administrator had power to receive them; the power he would now have to accept "national bank notes," which are money according to the usages and neces-

sities of commerce, as notes of the banks incorporated by the several States were money conventionally. Having this power, and no fraud or collusion being imputable to Reese, the purchase money was paid—the court of probate properly ordered the conveyance of title and its execution divested the title of the heirs. They were remitted for all right, legal or equitable, to the administrator, as they would have been if the payment had been in gold coin.

The decree of the chancellor, so far as it affects the validity of the conveyance to Reese and the purchasers claiming under him, and declares the purchase money unpaid, and a lien on the land for its payment, is reversed, and the cause remanded, with instructions to dismiss the bill as to Reese and the purchasers claiming under him, at the costs of the appellees. The appellees must pay the costs of this appeal in this court and in the court of chancery.