## HALE vs. HUSTON, SIMS & CO.

[ACTION ON PROMISSORY NOTE GIVEN FOR A LOAN OF CONFEDERATE TREAS-URY-NOTES.]

1. *Confederate treasury-notes, promissory note for loan of; without consideration and void.*—A promissory note given in consideration of Confederate treasury-notes loaned, is without proper consideration and void, notwithstanding the contract was made between citizens of the State, and without any illegal intent. (PECK, C. J., *dissenting.*)

2. *Same; bills of credit within the meaning of constitution of the United States.*—Confederate treasury-notes are not recognized by any law of the State or of the United States as property. Their circulation was adverse to public policy. They were bills of credit emitted by an illegal combination of States in violation of the Federal constitution.

3. *Ordinance No. 38 of convention of 1867, second section of; constitutionality of.*—The second section of ordinance 38 of the State convention of 1867, which ordains "that all bills, bonds, notes or evidences of debt, outstanding and unpaid, given for or in consideration of bonds or treasury-notes of the Confederate States, or notes or bonds of this State, paid and redeemable in the bonds or notes of the Confederate States, are hereby declared null and void, and no action shall be maintained thereon in the courts of this State," is not unconstitutional.

APPEAL from the Circuit Court of Sumter.
Tried before Hon. L. R. SMITH.

The appellees were sued on a promissory note, for the sum of six thousand dollars, made by them on the 18th of June, 1863, and payable to plaintiff or order one day after date.

The defense set up was, that the consideration of the note was Confederate treasury-notes, commonly called Con-

federate money, loaned by the plaintiff to them on the day the note bears date. On the trial, this plea was established by the proof, and also that the Confederate money, when lent, was of some value, and was used by defendants as valuable for their business purposes. This being all the evidence, the court charged the jury, that if they believed the evidence they must find for the defendants, to which plaintiff excepted, and now assigns the charge of the court for error.

TURNER REAVIS, for appellant.—The only question presented is, whether a promissory note given for a loan of Confederate money, at a time when the Confederate money was valuable to both parties, is void.

1. Such a note is *not* void, either for the want of a legal consideration, or for any other reason. It is supported by a valuable, legal, and moral consideration; and is not void on the ground of its being founded on a consideration against public policy. Public policy, morality, and justice, require that it should be recognized as valid. It is so recognized by the convention of 1865, and ought to be so recognized by all honest men.— See ordinance 26 of the convention of 1865, § 3, Revised Code, p. 59.

Chief-Justice Chase has recognized Confederate money as valuable, in several cases, and required parties who had received it in a fiduciary capacity, to account for its good money value. In *Keppell v. The Petersburg & Weldon R. R. Company*, he says, " the necessity for this currency was almost the same as the necessity to live. It *had* a sort of value, and a greater or less degree of purchasing power."

In the language of Chief-Justice Handy, in *Green v. Sizer*, " to hold that all such contracts are void, and that the parties acquired no legal rights under them, would be alike contrary to well settled rules of law, and to sound public policy."

And in the language of Judge Williams, in *Martin v. Horton*, to permit the maker of such a note, to receive such money from a party to whom it was valuable, and to use it for purposes valuable to himself, and then to escape his obligation to pay its value, would be to recognize a system of *legalized robbery.*

Hale v. Huston, Sims & Co.

And in the language of Chief-Justice Pearson, in *Phillips v. Hooker*, "*thus encouragement is to be given to dishonesty, justice is not to be administered, and the people of the country are to be involved in utter perplexity and confusion, in order to make a useless show of zeal on the part of the courts, to punish rebels.*"

The question is fully, and so ably argued and considered in the following cases, and so clearly and justly settled, that it would seem impossible to add to, or resist their force.—*Scheible v. Bacho*, 41 Ala. Rep.; *Green v. Sizer*, 40 Miss. Rep. 530; *McMath v. Johnson*, 41 Miss. Rep. 439; *Martin v. Hortin*, Bush's Ky. Rep. 629; *Phillips v. Hooker*, Phillips' (N. C.) Eq. Rep. 193; *Emerson v. Mallett, ib.* 234; *Turley v. Nowell, ib.* 301; *Cummings v. Mebane,* 2 Phillips' (N. C.) Rep. 315, January term, 1869; *Keppell v. Petersburg & Weldon Railroad Company*, decided at Richmond, by Chief-Justice Chase; *Harris v. Bank of Cape Fear*, decided at Raleigh, by Chief-Justice Chase, June 19, 1869; *Dearing v. Rucker*, 18 Gratt. Va. Rep. 426; *Boulware v. Newton, ib.* 708.

2. The 2d section of ordinance No. 38 of the convention of 1867, declaring such contracts void, is plainly unconstitutional, because it impairs the obligation of contracts. See the ordinance on page 185 of the acts of 1868; *Roach v. Gunter*, at the present term; *Weaver v. Lapsley*, at the January term, 1869; Opinion of Walker, C. J., in *Ex parte Pollard*, 40 Ala. Rep. 77, and cases therein cited.

WATTS & TROY, *contra.*

B. F. SAFFOLD, J.—The question is directly presented whether a loan of Confederate States treasury-notes is such a consideration as will support, in whole or in part, a promise to pay a like sum in lawful money of the United States. We know judicially that the Confederate States was an organization hostile to the United States, and seeking to overthrow its supremacy over the territory and the people of the States comprising the Confederation; that its treasury-notes were issued and used in pursuance, and in aid of, that unlawful and revolutionary purpose. No

one will deny that contracts made for the use of this currency in aid of the rebellion would be contrary to public policy, and consequently illegal and void. Whether the use of it by the citizens of the States in rebellion, in the transaction of their ordinary business, and without any illegal or criminal intent, was legitimate and such as ought to sustain a promissory note or other obligation given in consideration of a loan of it, we will further inquire.

In the first place, the time when the note sued on was made, and the consideration given for it, preclude the supt position that the defendants promised to pay the amoun expressed on its face in lawful money. To do justice between the parties, we must at once depart from the terms of the written contract. By what principle of law or equity shall we test their respective right and obligation? A promise to pay a stipulated sum of money in some specified commodity, is discharged by a payment of the value of the property at the maturity of the obligation.—*Jolly v. Walker's Adm'rs*, 26 Ala. 690; *Williams v. Sims,* 22 Ala. 512; *Young v. Scott*, 5 Ala. 475. But the article which is to be valued must be something either established or recognized by law as property, before a court can inquire of its value.

If it be said, that the plaintiff ought to recover the value of the Confederate money at the date of the contract, what authority have we for this? The same objection meets us as in the other case. A *quantum valebat* count can not be sustained, because the thing loaned is without the protection and recognition of law. Besides, it was not the agreement of the parties, nor is it the rule where payment is to be made in specific property.

The second section of ordinance 38 of the State convention of 1867, " concerning the value of contracts where the consideration was Confederate bonds or currency, and for the purchase of slaves," ordains " that all bills, bonds, notes, or evidences of debt, outstanding and unpaid, given for or in consideration of bonds or treasury-notes of the so-called Confederate States, or notes or bonds of this State paid and redeemable in the bonds or notes of the Confederate States, are hereby declared null and void, and no ac-

10

tion shall be maintained thereon in the courts of this State."

If it be said that this law is void, because it would impair the obligation of contracts, how can it be shown that Confederate money, the creation of an insurrection, is recognized, as the valid basis of a contract, by the constitution of the United States, which the purpose of its use was to destroy. Could a person be indicted and convicted for stealing Confederate money now? Could he be so dealt with for having stolen it during the war? Why is it now valueless?—the resources of the States which put it in circulation are not exhausted. It has been decided by this court and the supreme court of the United States that the Confederate government was not a *de-facto* government.— *Chisholm v. Coleman,* January term, 1869 ; *Texas v. White,* S. C. R. 1869. We, therefore, can obtain no aid from the principle of *lex loci.* The contract was not one of another State which we might enforce on the basis of comity, or refuse to execute because opposed to national policy.— Story on Conflict of Laws, § 244. It is one entered into under the domination of the laws of our own country, to which our courts must see that it conforms.

This note was given for a consideration against public policy. The circulation of these notes, in the ordinary business transactions of the citizens residing in the States in rebellion, was necessary to their use by the Confederate government in aid of the war. Without this circulation, the attempt to use them would have been a failure, and with the failure would have come the end of the rebellion. I do not mean to say that their circulation by the citizens was a crime to be punished, but it was efficient and indispensable aid to the rebellion, though involuntary. To hold that such a currency is a consideration for a contract, the obligation of which the Federal consitution may be invoked to sustain, is to invite and encourage insurrection, to which the people are always averse, and into which they are almost invariably forced by a comparatively few revolutionists.

It was given for bills of credit which no State, nor collection of States, can legally issue. To constitute a bill of

credit, within the constitution, it must be issued by a State, on the faith of a State, and designed to circulate as money. It must be a paper which circulates on the credit of the State, and is so received and used in the ordinary business of life. The individual or committee who issue it must have the power to bind the State. They must act as agents, and of course not incur any personal responsibility, nor impart, as individuals, any credit to the paper.—*Briscoe v. The Bank of Kentucky,* 11 Peters, 257. Every ingredient of this too liberal definition, in favor of the rights of the States, entered into the composition of the Confederate States treasury-notes. That they were emitted by a combination or confederation of States, can not alter their character. Indeed, the combination itself was a violation of the constitution.—Const. art. 1, § 10, ¶ 3.

Assuming that they were bills of credit, is the contract between these parties on that account void? It is a sufficient answer to the question, to say that the supreme court of the United States has so decided.—*Craig v. Missouri,* 4 Peters, 443 ; see, also, *Linn v. State Bk. of Illinois,* 1 Scam. (Ill.) R. 87. A simple consideration will convince us that it must be so. The evil intended to be suppressed was extensively practiced by the colonies before and during the revolution of 1776. The effects were ruinous to society. Property was in confusion, business was prostrated, or carried on with distrust and suspicion, and every incentive to energy and enterprise was destroyed. Results so disastrous must be prevented. How can the prohibition be made effectual, if the circulation of such bills by the citizens of a State be lawful, or, being illegal, they are nevertheless the valid consideration of a binding obligation? What more effective agent for their entire suppression can be employed, than to declare that the contracts of which they are the consideration are absolutely void?

The consideration of this note was something not recognized by any law of the Union or of this State as property. It was adverse to public policy, having been created for purposes hostile to the Union. It was bills of credit emitted by an illegal combination of States, in violation of the Federal constitution. A law of the State forbids the

courts to enforce such contracts. The note is, therefore, void.

The judgment is affirmed.

PETERS, J., *concurs.*

PECK, C. J., *dissents,* on the ground that the supreme court of the United States, in the case of *Thorington v. Smith,* (8 Wallace, p. 1,) had decided this question adversely to the views of the majority of this court, and that its decision upon the matter was binding.