# Whitfield v. Riddle, Administrator.

*Action on Promissory Note by Payee against Maker.*

1. *Confederate currency; sufficient consideration to support promissory note.* — A promissory note, executed by and payable to a party residing at the time within the Confederate lines, for a loan of Confederate currency is supported by a valid consideration. (*Hale* v. *Huston, Sims & Co.* 44 Ala. 134, overruled.)

2. *"Dollars," meaning of.* — The word "dollars" in such a note does not necessarily mean dollars of the United States, but the contract must be read in light of surrounding circumstances to determine in what currency it was solvable.

3. *Same; measure of recovery.* — In an action since the war on a note payable during the war, given in consideration of the loan of Confederate currency, and intended to be discharged in "dollars" of that currency, the measure of recovery is the value of the currency at the time of the loan.

[Whitfield *v.* Riddle.]

APPEAL from the Circuit Court of Marengo.

Tried before Hon. L. R. SMITH.

This was an action on a promissory note executed by defendant's intestate, and others not sued, on the 3d day of April, 1863, and payable to plaintiff twelve months after date, for ,seven thousand five hundred and sixty dollars, " money loaned." The evidence showed that the note was given for Confederate currency, loaned, and that the payee and makers of the note were at the time resident citizens of Marengo county, Alabama.

The court charged the jury that if they believed, from the evidence, that the note was given for the loan of Confederate currency, they must find for the defendant; to which charge plaintiff excepted.

F. S. LYON, with whom was THOS. H. WATTS, for appellant.

BROOKS & LYON, *contra.*

MANNING, J. — The question presented in this cause is, whether a loan made in 1863, in Confederate treasury notes, is a sufficient consideration to sustain as valid a promissory note executed for it to the lender, — in a transaction between persons residing at the time in this State. The court below answered the question in the negative. The supreme court of this State, in *Scheible* v. *Bacho* (41 Ala. 423), adjudged a note given for such a consideration to be valid, — WALKER, C. J., delivering the opinion of the court. This was in January, 1868.

Afterwards, in 1870, our immediate predecessors on this bench made a contrary decision, PECK, C. J., dissenting, in *Hale* v *Huston, Sims & Co.* 44 Ala. 134.

In each of these cases one out of the three members of the court differed from the other two. And under the circumstances, we feel it to be our duty to follow that decision which we consider best sustained by argument and authority.

The point was presented for decision in Kentucky early in 1866. In a portion of that State which was, at the time, within the lines and under the dominion of the Confederate authorities, an owner of land sold it, and received the price in Confederate treasury notes, — he executing a bond to make titles afterwards. Having refused to comply with the obligation of his bond, he was sued; and the court unanimously held it to be valid. A similar decision has been made in the supreme court of Tennessee in *Naff* v. *Crawford* (1 Heiskell), overruling a contrary decision that had been previously made.

VOL. LII.

[Whitfield v. Riddle.]

In June, 1867, the case of *Phillips* v. *Hooker* was decided in the supreme court of North Carolina. The defendant was sued in equity for a specific performance of his agreement to convey lands, and insisted that he was not bound to do so, because the only payment made for them was made during the war, in Confederate treasury notes, a currency illegally issued for an unlawful purpose. The judges unanimously agreed that the defence set up was not a valid one. A passage from the opinion of Chief Justice PEARSON in that case, full of cogent reasoning, is incorporated in that of WALKER, C. J., in *Scheible* v. *Bacho, supra.* "It may be conceded" (says PEARSON, C. J.), "that if at the outbreak of an insurrection parties to contracts, *with a view to aiding the cause,* by giving credit and circulation to its paper, receive it as money in their dealing, such contracts are illegal. But that is not the case under consideration. In 1862 the contest had assumed the magnitude and proportions of war; each party in territorial limits had the boundaries of a mighty nation; and each party counted its people by millions. . . . . The government of the United States was unable to protect the people; and there was no currency but Confederate treasury notes. . . . . Was the merchant to close his store, the blacksmith and shoemaker to quit work, and the farmer to let his tobacco and surplus grain rot on his hands, and allow his family to suffer for clothing and the other necessaries of life, or do an illegal act by receiving Confederate notes? Really, unless the receiving of such notes can be connected with a criminal intent to aid the rebellion, the question seems to me too plain to admit of argument. A naked statement exposes the absurdity of the proposition."

Taking up the same line of argument in *Scheible* v. *Bacho*, Chief Justice WALKER says: "The issue of the Confederate States currency had the effect of contributing means to prosecute the war. The passage of that currency in the making of contracts may have contributed indirectly to the preservation of its value. This indirect, remote effect does not vitiate the contracts based on such currency." He then proceeds, by ample citations from authorities of the highest order, to establish this and some kindred propositions; and in conclusion of the argument he exclaims: "Surely . . . . a humane government would prefer a submission to the use of the currency prescribed by the government actually dominant, to the dreadful consequences which would result from the opposite course. . . . . Humanity and civilization would be shocked by the fixing of a stigma upon obedience to a necessity which bound and fettered the will by an inexorable power. Obedience to this necessity was rendered cheerfully or reluctantly, according as the cause of the Confederate government was or was not favored; but in every case such obedience was unavoidable."

And in December in the same year (1868) Chief Justice CHASE delivered the unanimous opinion of the supreme court of the United States, in *Thorington* v. *Smith* (8 Wall. 1), an opinion imbued with the humane and enlarged ideas of the publicists, and confirming the expectations intimated as above, by Chief Justice WALKER.

After adverting to the rules of public law applicable to a people whose regular government has been expelled by another of paramount force, whether that other be a foreign government or one set up by insurrection, Chief Justice CHASE says of the Confederate government: "It was by this government exercising its power throughout an immense territory that the Confederate notes were issued early in the war; and these notes, in a short time, became almost exclusively the currency of the insurgent States. . . . . While the war lasted, they had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people. . . . . It seems to follow, as a necessary consequence from this actual supremacy of the insurgent government as a belligerent, within the territory where it circulated, and from the necessity of civil obedience on the part of all who remained within it, that this currency must be considered in courts of law in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States. Contracts stipulating for payments in this currency cannot be regarded, for that reason only, as made in aid of the foreign invasion in one case, or of the domestic insurrection in the other. They are transactions in the ordinary course of civil society; and though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We cannot doubt that such contracts ought to be enforced in the courts of the United States, after the restoration of peace, to the extent of their just value."

It was, accordingly, decided that the maker of a note payable in that currency, who was sued upon it in a federal court after the war was over, must pay the value of the amount of that currency specified in the note to his creditor.

PECK, C. J., in dissenting from the majority in *Hale* v. *Huston, Sims & Co.*, referred to *Thorington* v. *Smith* as an authority adverse to the conclusion attained by his colleagues. One of them, moreover, in delivering the opinion of the entire court, in *Roach* v. *Gunter* (44 Ala. 209), about the same time, and at the same term of the court, said: "The right of the citizens of Alabama to contract with each other was as complete during the war as it was before, or is now. They were at that

[Whitfield v. Riddle.]

time constrained by necessity to use the Confederate currency as a medium of exchange." Of course, therefore, that currency had a " purchasing capacity." In the language of Chief Justice CHASE (supra), it was "used as money in nearly all the business transactions of many millions of people." If, then, some of those millions of people, wishing to obtain that currency for the payment of debts, or purchase of property, should borrow it of others, why should they not be required to perform the contracts upon which it was obtained? If the courts of the United States, the party offended by the great insurrection, would enforce such obligations entered into by persons in Alabama during the war, the courts of Alabama ought, it seems to us, to follow their decisions.

Perhaps the majority of the court that decided the case referred to supposed there was a difference in principle between a promissory note payable in Confederate currency, and one given for the loan of such currency. That this was not the opinion of the supreme court of the United States is made manifest by subsequent decisions.

In Delmas v. Insurance Company (14 Wall. 661), decided on the authority (upon this point) of Thorington v. Smith, the supreme court of the United States held that a note and mortgage to secure it, the consideration of which was Confederate money, not only constituted a valid contract, but that the courts of the United States would protect and enforce the obligation thereof against a clause in the Constitution of Louisiana which declared that " All agreements, the consideration of which was Confederate money, notes, or bonds, are null and void; and shall not be enforced by the courts of this State." A similar ruling was made by the same court in Planters' Bank v. Union Bank, 16 Wall. R. 483. And in a subsequent case the same tribunal, referring to the case of Thorington v. Smith, said: " It would have been a cruel and oppressive judgment if all the transactions of many millions of people composing the inhabitants of the insurrectionary states, for the several years of the war, had been held tainted with illegality, because of the use of this forced currency, when those transactions were not made with reference to the insurrectionary government."

This court said, in Riddle v. Hill (decided at June term, 1874): " On this and kindred distressing questions, the inevitable result of the war and which are of especial interest to the people of ten States, and on which uniformity of decision is of vital importance, this court has often announced its purpose to follow the adjudications of the supreme court of the United States when made. The settlement of these questions, so far as dependent on judicial decisions, probably lies within the province of that tribunal. If it does not, to avoid diversity of de-

cisions on these questions, and a conflict of authority, there is, it seems to us, an eminent propriety in state tribunals yielding to its adjudications."

Moved by these considerations, we feel constrained to over-rule the case of *Hale* v. *Huston, Sims & Co., supra.* We hold, that contracts and transactions entered into and had between persons residing in Alabama, during the late civil war, —of which the notes known as Confederate currency constituted the consideration, — are, if not otherwise exceptionable, valid and binding, and should be upheld and enforced in the courts of this State.

When a contract of this sort appears to be for the payment of money which is described as " dollars," the cases we have referred to — *Riddle* v. *Hill, Thorington* v. *Smith, Confederate note case, supra,* and others — decide that the word " dollars " is not to be taken necessarily as dollars of the United States; but that the circumstances attending the transaction and be-longing to it are to be looked to in order to determine whether it was not understood and intended that the debt should be discharged in dollars of Confederate currency.

And if such was the meaning of the parties (since contracts cannot be performed according to that meaning, because Con-federate treasury notes ceased to be dollars when, by reason of the annihilation of the power which issued them, they ceased to be used as the money of any political community whatever), it follows according to the decisions in *Herbert et al* v. *Easton* (43 Ala. 550), and *Riddle* v. *Hill* (*supra*), that the measure of recovery in suits on account of such contracts is the value of the consideration, whether property, or Confederate cur-rency, at the time of the making of the contracts.

This rule may not, in all cases of this sort, be defensible on strict legal principles ; but it is not inequitable, and we con-sider it established by decisions of this court, to which we yield our adherence.

The judgment of the court below is reversed and the cause remanded.[1]

---

[1] The opinion in this case was delivered at the January term, 1875, but in send-ing the MS. to the printer it was accidentally placed among the opinions of the June term following.