63   527,
97   687

# Henry & Co. *v.* Northern Bank of Alabama.

*Action against Bank, for Money Deposited and Collected.*

1. *Deposition taken de bene esse; when suppressed, or not.*—When the deposition of a witness is taken, on the statutory ground that the defense, or a material part thereof, depends exclusively on his testimony (Code, §§ 3069, 3078), the deposition may be read in evidence on the trial, although the plaintiff makes the necessary affidavit requiring his personal attendance, if it is affirmatively shown to the court that the witness is incapable, both physically and mentally, of attending and testifying in person.

2. *Declarations of agent; admissibility against principal.*—In an action against an incorporated bank, the declarations or admissions of its president can not be received to establish a liability against it.

3. *Liability of bank for moneys deposited and collected during late war.*—A customer of an incorporated bank, who deposited with it for collection, at different times, between November, 1861, and April, 1862, notes and drafts on third persons; giving no instructions as to the kind of funds to be received, and making no demand until after the close of the war,—can not recover, under the common counts, more than the value of Confederate currency when the demand was made.

4. *Error without injury in rulings against plaintiff.*—When the plaintiff has recovered a verdict and judgment for a greater amount than, on the undisputed facts in evidence, he was entitled to recover, this court will not, at his instance, inquire into the correctness of any of the rulings of the court adverse to him.

APPEAL from the Circuit Court of Madison.

Tried before the Hon. LOUIS WYETH.

This action was brought by the partners composing the late firm of A. G. Henry & Co., a mercantile partnership doing business at Guntersville, in Marshall county, against the Northern Bank of Alabama, a corporation chartered under

the laws of this State prior to 1860, and located at Huntsville, in Madison county; and was commenced on the 10th April, 1868. The original complaint contained two counts; the first claiming $6,154.25, alleged to be due on account stated between plaintiff and defendant, on the 4th April, 1862; and the second claiming the same amount, " due by account for money deposited by plaintiff with defendant, to be repaid on demand," and alleging a failure to pay on demand made on the 10th December, 1867. An amended complaint was afterwards filed, by leave of the court, claiming the same sum as "due by account on the 10th December, 1867, for money had and received by the defendant, for the use of the plaintiff;" and also " by account due on the 4th April, 1862, for money had and received," &c. The defendant pleaded, to the original complaint, " the general issue, with leave to give in evidence any matter that would be good in bar of the plaintiffs' action;" and to the amended complaint, the statutes of limitation of three and six years, and the general issue. Afterwards, several additional pleas were filed, "in short by consent:" 1st, tender of $120 in gold before the commencement of the suit; 2d, that "no demand was made before suit brought, of any debt or duty by defendant owing or due to plaintiffs;" 3d, tender of $120 in gold, and $6,154.25 " in the notes of the State banks of Alabama, Tennessee, South Carolina, and Georgia, which were current when the deposits were made," with an offer to bring the money into court.

On the trial, as the bill of exceptions shows, " and before the jury was impanneled," the plaintiffs moved the court to suppress the deposition of James I. Donegan, the former president of the Northern Bank of Alabama, which had been taken on behalf of the defendant; and they reserved an exception to the overruling and refusal of their motion, under the facts stated in the opinion of the court. The plaintiffs offered in evidence, in support of their action, a copy of the "pass-book" which they had received from the defendant (the original having been lost), showing the state of accounts between them, and also the defendant's "ledger," which contained the same entries, and corresponded in every particular with the "pass-book." These entries were as follows : " Nov. 18, 1861, deposited in gold, $120 ;" " Nov 19, deposit, C., $350 ;" " Nov. 20, by deposit, C., $45 ;" " Nov. 25, deposit, $2,600 ;" " Jan. 13, 1862, deposit, C., $1200 ;" " Jan. 18, deposit, C., §2,255.22 ;" " Mar. 27, deposit, $360.65 ;" " Nov. 20, 1861, to check, $45 ;" " Jan. 21, 1862, to check, $731.62 ;" " Balance, Jan. 1, 1863, $6,154.25." In the "pass-book," however, this balance was struck as of the 4th April,

[Henry & Co. v. Northern Bank of Alabama.]

1862; and it was proved by the teller and book-keeper of the bank, who were examined as witnesses, that the letter C., as used in these entries, meant Confederate currency. The plaintiffs proved, also, that on or about the 10th December, 1867, one of their attorneys presented said "pass-book" to the defendant's cashier, Th. Lacy, and demanded payment of the balance shown to be due to them; "that said Lacy, for the bank, refused to pay any portion thereof, but assigned no reason for said refusal; nor did he deny the liability of the bank, or the correctness of the amount; nor did he make any tender, in whole or in part, of any sum, or any kind of money; and there was no other proof on the point of demand and refusal, or of what occurred between said Lacy and said"·attorney. Said attorney further testified, in this connection, "that he would have accepted from said Lacy only 'green-backs,' or national-bank currency." The plaintiffs read in evidence, also, several letters which they had received from the defendant's cashier, showing that the $2,600 deposited on the 25th November, 1861, was collected on the plaintiffs' draft on Ewing, McCrarey & Co., of Nashville; and that the $1,200, entered as a credit under the date of January 13, 1862, was paid in to the plaintiffs' credit, by H. L Miller, "in current bank-notes."

"It was in proof, also, that the defendant suspended specie payments on the 18th September, 1861, and never resumed, and was the last bank to suspend in the Confederate States; that after the suspension of specie payments, and before any of these deposits were made, the officers of the bank were instructed not to receive any deposits of State Bank currency, or of Confederate treasury-notes, unless the depositors would consent to accept payment in like kind, or in Confederate notes, whichever the bank had on hand at the time. But it was in proof that the minute-entries of the bank contained no such order; and it was not proved by any one that Henry had any such notice of any such directions to the officers of the bank, except what is contained in the deposition of Donegan; and Henry himself testified, that no such notice had ever been given him. The said A. G. Henry proved, that the deposit of $350 on the 19th November, 1861, was in State currency; that the deposit of $45 on the 20th November, 1861, was in State Bank currency; that the deposit of $1,200 on the 15th January, 1862, was in State Bank currency; that the item of $2,600, of date November 25, 1861, was a collection made for him by the defendant, on his check on Ewing, McCrarey & Co., of Nashville, Tennessee; that the item of $2,255.22, was a collection made for him by the defendant, on a certificate of deposit on a bank in Memphis, Tennessee;

and that the item of $360.65, of date March 27, 1862, was a deposit placed to his credit by Robert Fearn, but in what kind of currency he did not know. Cruse, the teller of the bank, proved that it was in Confederate treasury-notes. Said A. G. Henry further stated, that when he drew said order on Ewing, McCrarey & Co. for $2,600, and when he delivered the same to the defendant for collection, and when he remitted from Memphis said certificate of deposit for $2,255.22, on the Memphis Bank, he gave the defendant no directions as to the kind of money in which said certificate and cheque should be collected, but he supposed, if he thought anything about it at all, that it would be collected in currency. Said witness stated, also, that when he made his said deposits with said bank, and when he drew said cheque on Ewing, McCrarey & Co., and when he remitted said certificate of deposit on the bank at Memphis, for collection, he had no notice from any officer of the bank that said deposits would be received, and said collections made, only upon the condition that he would receive from said bank payment therefor in paper of the kind collected; that no such notice was given to him by any one; that said deposits were received, and said collections made, without any notice to him that the bank assumed therefor only a qualified liability, which it could discharge in currency of the kind it received from him; and that at the time of these transactions, and for a long time prior thereto, and now, he resided at Guntersville, in Marshall county. He stated, also, that when said deposits and collections were made, he knew that all Southern banks had suspended.

"It was in proof, also, that the defendant, after the suspension of specie payments, received the notes of the suspended banks of the Southern States, and Confederate treasury-notes, as bankable, and paid them out in the ordinary transactions of the bank; that it closed its doors, and removed its assets to Augusta, Georgia, on the 27th August, 1863, and did not thereafter resume business, or have any meeting of its board of directors, until the 8th July, 1865; that in the latter part of June, or the first of July, 1863, it gave notice by posters, stuck up at several places in Huntsville, to its depositors, to come forward and withdraw their deposits; but there was no proof that any such notice was sent to the plaintiffs, and they proved that they never received any such notice, nor had they any knowledge of the existence of such notice until this trial. It was in proof that, in June and July, 1863, there was no mail communication between Huntsville and Guntersville. The defendant's books, which were given in evidence, showed that between the suspension of specie pay-

[Henry & Co. v. Northern Bank of Alabama.]

ments, on the 18th September, 1861, and the 3d June, 1863, the defendant discounted bills and notes to the amount of $542,966.49; and between the 18th November, 1861, and the 27th March, 1862, the dates of plaintiffs' first and last deposit respectively, the defendant discounted notes and bills to the amount of $360,760.57; but a large proportion of what were called discounted bills and notes, on the books of the bank, were simply renewals of antecedent debts. It was proved that, on the 27th August, 1863, when the defendant transferred its assets to Augusta, Georgia, they consisted of the following items: specie, $37,130.06; State Bank notes on Georgia, Tennessee, Alabama, South Carolina, &c., $25,000; bonds of the State of Alabama, $307,500; Confederate States 8 per cent. bonds, $20,900; Confederate interest-bearing treasury-notes, $90,800; Confederate treasury-notes, $9,200.

"It was in proof, also, that interest-bearing treasury-notes were not issued until the Fall of 1862; that at Huntsville, in November, 1861, State Bank currency and Confederate treasury-notes were from ten to fifteen per cent. below gold, and from forty to fifty per cent. below gold in March, 1862; that the defendant declared a semi-annual dividend of four per cent. on its capital stock ($500,000) on the 4th February, 1862, and another semi-annual dividend of four per cent. on the 4th February, 1863, both payable in Confederate treasury-notes; and that the books of the bank showed balances due to depositors, upon deposits made during the war, and which have not been demanded since the war, of $.7,405.28, of which sum $13,426.85 were for dividends declared during the war in favor of persons owning stock in the bank. Some of the persons to whose credit these deposits stood, testified that they had not demanded them of the defendant since the war, because it was their understanding when they made said deposits that they were only to be paid in currency, of like kind to that deposited; but others, to whose credit such balances stood, stated that they had not demanded them since the war, because they had forgotten that such balances stood to their credit, but that they had no notice from the bank, when they made their deposits, that they were only to be paid in money of like kind with that deposited." The defendant offered in evidence also, in this connection, a list of the persons who made deposits with it after its suspension of specie payments, "and proved that none of these depositors had ever demanded payment since the war." The defendant took the depositions of several citizens and merchants who resided during the war in Nashville and Memphis, Tennessee, and whose testimony was to the effect that, during the war, Confederate treasury-notes and the notes of

suspended banks constituted the only currency in circulation in those cities, and were paid out by the banks in satisfaction of all demands on them. The plaintiffs objected to this evidence, and reserved an exception to its admission.

James I. Donegan, whose deposition was read in evidence against the plaintiffs' objection, testified as follows: "I am the president of the Northern Bank of Alabama, and have been since its organization. The claim upon which the plaintiffs are suing in this action, originated as follows: Some time in November, 1861, Mr. A. G. Henry, one of the plaintiffs, was in the bank, and stated to me that he had some six or seven thousand dollars in the notes of various suspended banks, of which he wished to make a general deposit in the Northern Bank of Alabama. I replied, that so much Confederate money was appearing in circulation, it was likely to take the place of every other kind of money, and that the probability was there would be no other kind of money in circulation; and that the bank could not receive the deposit, unless he would agree to receive Confederate money for it. He then remarked, that he would not deposit it, but, if I would take and keep it for him, he would make a special deposit of it. I told him, in reply, that I would take it, and take the same care of it as of our own, though I considered it a great risk, as war was raging. I took it from him, and kept it, and returned it to him after the war. In the same conversation, in November, 1861, he remarked, that plaintiffs had balances due them at various points in Tennessee, which would be sufficient to pay off the balances they owed to others, and asked me to oblige him by collecting them, assuring me that he would check it out immediately. I told him I would do so, if possible, upon the terms on which alone I could receive deposits; which was, as I have stated above, that the depositor would agree to receive Confederate money: I would receive no general deposits, except with the understanding that they were payable in Confederate money. The account sued on, with the exception of one special deposit of $120 in gold, consists of deposits received and collections made upon the special terms and agreement above stated, on which alone, at that time, the bank would receive general deposits, and make collections. The bank has always been ready, and still is, to pay the gold specially deposited."

"A. G. Henry testified, in rebuttal of the statements contained in Donegan's deposition, that he had no conversation with said Donegan in the Fall of 1861, with regard to any of the matters to which Donegan testified; that he had no greement or understanding with said Donegan when he

[Henry & Co. v. Northern Bank of Alabama.]

made said deposits, and gave said check on Ewing, McCrarey & Co., and remitted from Memphis, where he received it, said certificate of deposit on the Bank of Memphis, that said deposits and collections would only be received and made on the condition that he was to be paid in currency of the like kind with that deposited and collected; that nothing whatever was said to him by Donegan, on that subject, at the time of said deposits and collections, but said transactions were simple deposits, without any qualification as to the bank's liability therefor; that the only conversation he ever had with Mr. Donegan, of the character mentioned in Donegan's deposition, was in the Fall of 1862, when he went to the bank for the purpose of depositing between $5,000 and $10,000 in State Bank notes; that he then had an interview with Mr. Donegan, in the bank, and told him what he wished to do, and Donegan thereupon told him that the bank would not take said notes on deposit, except with the understanding that he was to be paid in Confederate treasurynotes; that he refused to deposit said bank-notes on this condition, and made a special deposit of them with Mr. Donegan, which was not entered on the books of the bank; that said special deposit was returned to him after the war by Mr. Donegan; and that this was the only conversation he ever had with Mr. Donegan on that subject. Plaintiffs offered ᴐ prove, by said A. G. Henry, that after the war, and before ᴐ institution of this suit, he called on Mr. Donegan, the ᴐsident of said Northern Bank of Alabama, for a settlement of the claim now sued on; that said Donegan, in that conversation, admitted the liability of the bank, and proposed to settle the claim in this way: to allow plaintiffs one half of said claim, provided they would take $10,000 in the stock of the National Bank of Huntsville, giving his note for the difference between what was allowed him on said claim and $10,000, payable at twelve months; that said proposition was declined by plaintiffs; and that said Donegan, when said proposition was made by him, said nothing about buying the peace of the bank on a disputed claim, nor was there any denial of the justice of the claim, and the bank's liability therefor. To this evidence the defendant objected, because it was illegal and irrelevant; which objection was sustained by the court, and the evidence excluded; and the plaintiffs excepted."

The court charged the jury in writing, among other things, as follows: "The plaintiffs can recover only on the evidence offered which sustains their cause of action, as presented in their complaint; and in this case, they must show by proof that the defendant is indebted to them upon 'an account

stated,' or 'for money deposited,' or for 'money had and received by the defendant, for their use, on or prior to the 10th December, 1867,' or 'for money had and received by the defendant, for the use of the plaintiffs, on or before the 4th day of April, 1862;' and failing to make this proof, they can not recover. It is important that you should know what is meant, in law, by the word 'money,' and the term 'account stated.' Money is—1st, the minted coin issued or circulated under the laws of the United States; 2d, bank-notes, payable and redeemable in such coin; 3d, the paper commonly called 'green-backs,' and the notes issued under the laws of the United States, called 'national-bank notes.' In this definition I do not include the notes issued by the Confederate States during the late war, nor the notes of banks which had suspended specie payments, during such suspension. Such might be circulated as a medium of commercial transactions, but were not money. You will please remember this definition of money, and apply it to the several portions of this charge which may relate to that subject. It is true, indeed, that a creditor might, if he chose, receive Confederate notes, or the notes of suspended banks, in payment of his debt; but, if refused, the debtor could not, under the plea of tender, avail himself of an offer to pay such paper."

"To enable the plaintiffs to recover on a count on an account stated, they must prove, either an actual accounting together, or an admission by the defendant that a fixed and certain sum of money is due to the plaintiffs. If the transactions which are the cause, and, to a great extent, the subject-matter of this suit, had occurred in times of peace, there would be but little difficulty in stating the law applicable to every phase of the case. But, as they occurred in times of war, we must remember that fact in all that we may say or do, and give to the words and phrases then used the meaning which they then had; and in all that I may give you in charge, or refuse to give as asked by counsel, I shall be governed by these principles which I have just stated, having reference to the then condition of the country. It is conceded that the transactions on which this action is founded, with the exception of the demand, occurred on and after the 18th November, 1861, in this immediate section of the country, and during the continuance of the war between the Confederate States and the United States. 'We know, as matter of public history, that shortly after the war commenced, and before the first of November, 1861, gold or silver coin, or any currency convertible into it, ceased to be a circulating medium in this State.' 'In all business transactions, it ceased to be a representative of value.' The law, concurring

with justice, requires that a judicial tribunal should look to these circumstances, in determining the legal effect of contracts, and the signification of the language or words the parties have employed. It would be injustice, if we conclusively imputed to the term 'dollars,' as found in the entries in the defendant's books made here during the war, the significance of dollars employed in contracts made when the constitution and laws of the United States were prevailing without obstruction. Independent of, and without regard to any verbal agreement, a court, called on to pronounce judgment on a contract made under such circumstances, must consider the historical facts, which may enable it to arrive at the intention of the parties, in ascertaining the legal effect of the transactions which constitute whatever of contract may have been made between them. If, during the war, and on and after the 18th November, 1861, the plaintiffs placed in the hands of the defendant, for collection, certain drafts on Nashville and Memphis, when the banks of those cities had suspended specie payments, and when the only circulation was the notes of suspended banks and the notes of the Confederate States; then the jury, in connection with such proof, may consider the principles I have just mentioned, in determining whether or not the plaintiffs, actually or impliedly, authorized or permitted the defendant to collect these drafts in the notes of the suspended banks, or in the notes of the Confederate States. If they did, they can hold the defendant responsible for nothing more on such collections.

"In reference to the first count in the complaint, the only count on 'an account stated,' if you believe from the evidence that the plaintiffs' agent took with him the plaintiffs' bank-book, and went to the defendant's banking-house, and demanded payment of the balance shown on that book to be due; and that the officer of the bank, of and from whom the demand was made, denied the liability of the bank, or its indebtedness to the amount claimed, and refused to pay it; this is not, of itself, sufficient evidence to sustain the count on 'an account stated,' except for the amount of money, if any, then conceded to be due. Nor is it sufficient, if supplemented by the additional proof that, in April, 1862, plaintiffs wrote to defendant for information in regard to their account, and received a bank-book, in which, in connection with each deposit therein mentioned, there was a word, or letter, indicating that the deposit was made in gold, or in currency, after the suspension of specie payments by the banks, and during the existence of the war between the Confederate States and the United States; because such statement in said bank-book, so qualified, did not contain an unqualified

admission of an existing indebtedness, in any ascertained and fixed amount of money,' beyond the amount of gold, or other legal money mentioned in the book; but, for the amount mentioned as deposited in gold, or other legal money, it is evidence under this count. Nor is such a bank-book, so marked, such a statement of an account as, in and of itself, will sustain a count on an account stated, unless you believe, from all the evidence, that the bank, through its officer, and in this manner, did acknowledge an indebtedness in 'legal money' as above described. When money is deposited in a bank, the bank becomes the debtor of the depositor, to the extent of such deposit; but, when a deposit is made in something else, which is not money, then the bank is liable only for the thing or commodity deposited, or its value at the time the demand is made for it. If no proof is made of its value, then you can not attach any value to it."

The plaintiffs reserved several exceptions to different portions of this charge, and requested twelve separate charges, covering the points to which exceptions were thus reserved; which charges were refused by the court, and exceptions duly reserved to their refusal. The charge given, the refusal of the several charges asked, and the rulings of the court on the evidence, as above stated, are now assigned as error.

L. P. WALKER, for the appellants.

HUMES & GORDON, and D. P. LEWIS, contra.

MANNING, J.—The deposition of J. I. Donegan was taken in 1872, several years before the trial of this cause, for the defendant, upon the statutory ground that the defense, or a material part thereof, defended exclusively on the evidence of this witness.—Code of 1876, § 3069, cl. 5. At the time of the trial, in November, 1877, plaintiff made an affidavit, according to section 3079, that he believed the personal attendance of the witness on the trial of the cause was necessary, and that he resided in Madison county; in which county the court was held. Whereupon, the judge made an order, and a notice thereupon was issued and served, requiring of the witness his personal attendance, to testify orally before the court; and he not appearing, the plaintiff insisted that, under said section, his deposition "must be suppressed." But, it being proved by the family physician of said Donegan, and by his son, a member of his family, that his physical condition was such that his personal attendance at the trial would probably endanger his life, and that he was men-

tally imbecile (all of which was undisputed), the motion to suppress the deposition was overruled, and the deposition read in evidence. Plaintiff objected and excepted to the testimony, and to the ruling of the court, and here insists that it erred.

The legislation on this subject must be considered as a whole. Its object was to enable either party to take and secure in writing the evidence of an important witness in a pending cause, to be used on the trial, subject to the right of the adverse party to require that he should attend and testify in person before the jury, if then able to do so. In this instance, it was shown that the witness was both physically and mentally incapable of attending, and testifying in person. The object of the law would, therefore, have been defeated by the suppression of his deposition, and there was no error in permitting it to be submitted to the jury.

2. Nor did the Circuit Court err, in refusing to permit the plaintiff, Henry, to testify that Donegan, the president of the Northern Bank of Alabama, at a time when he was interested in establishing a national bank under the acts of Congress, at Huntsville, in 1867, admitted the liability of the Northern Bank to the plaintiffs, and proposed "to allow plaintiff one-half of his claim, provided plaintiff would take $10,000 of the stock of the National Bank of Huntsville, giving his note for the difference between what was to be allowed him on said claim and said $10,000, payable at twelve months." Although Donegan "said nothing about buying the peace of the bank" on that occasion (the Northern Bank of Alabama), it was not within the scope of his authority to charge it with a debt, by his admission. The management of its affairs had been committed, by the charter, to a board of ten directors. Debts of the bank might result from its contracts, or arise out of transactions with it, but could not be created by the mere admissions of its president, any more than its rights could be released or annulled by his unauthorized directions.—*Spyker v. Spence*, 8 Ala. 333.

3. A more important question remains to be considered. Plaintiffs, residing at Guntersville, in Alabama, had dealings with defendant, the Northern Bank of Alabama, in November and December, 1861, and the early part of 1862, during the war between the Confederate States and the United States of America. The only circulating medium then in use—that by means of which all the business of the country was carried on—consisted, in part, of the notes of suspended Southern banks, not redeemed or redeemable in coin, and much more largely, almost entirely, of the treasury-notes issued to circulate as money, by the government of the Con-

federate States. These treasury-notes were promises to pay the number of dollars specified in them, respectively, when a treaty of peace should be concluded between said Confederate States and the United States of America. A currency so precarious, kept in circulation by the imperious exigencies of a period of revolutionary turmoil, when a government newly set up, supported by large armies, and many millions of people, was struggling to maintain in these Southern States the authority it had seized from an older and stronger government, supported by larger armies, and more millions of people, who lived outside of the same territory, could not be otherwise than of uncertain and doubtful value. This fact was recognized by everybody. The paper in use as a currency not only had no intrinsic value, but its redemption ultimately was wholly problematical. But, being forced into universal use by the necessities of the times, it was contracted for, received, and paid out, as a substitute for money, because there was nothing else with which the functions of money in the transaction of business could be performed. As a consequence, the banks of the country were compelled to receive and pay out this currency, or close their doors, and cease to exist. If they had done the latter, the people would have been deprived of the useful agency of these institutions in collecting debts due from one to another, keeping their funds on deposit, and paying them out on demand upon cheques or orders.

It was to do these things for them, that plaintiffs availed themselves of the services of the Northern Bank of Alabama. They deposited in it notes, cheques, and other commercial paper, that it might collect and take care of the proceeds, and have the amount thereof forthcoming when and as demanded. They knew, also, that it could not make collections, in any other than Confederate currency; and this they authorized the bank to take for them, and engaged to take from it, under the extraordinary circumstances of the times, by not informing it that they would not do so. Mr. A. G. Henry, himself, testified that "when he drew said order on Ewing, McCrarey & Co., of $2,600, and when he delivered the same to said bank for collection, and when he remitted from Memphis said certificate of deposit for $2,255 22-100, on the Bank of Memphis, he gave the defendant no directions as to the kind of money" that should be required, and that "he supposed, if he thought anything about it at all, that it would be collected in currency." Outside of public knowledge on the subject, the testimony shows nothing else could be obtained.

This suit was brought April 10th, 1868. The complaint

claims, in the first two counts, $6,154.25, on an account stated; the first count alleging that the account was stated April 4th, 1862; and the second, that it was stated the 10th day of December, 1867; and by two other counts, subsequently added, the same sum is claimed to be due, for moneys had and received by defendant, for the use of plaintiffs, at those same dates respectively. There is no claim founded on a count setting forth the special facts of the case, or the particulars of any transaction. The evidence relied on by plaintiffs, to show such indebtedness, was the pass-book they received in April, 1862, of defendant, and its account with them on its books, corresponding with the entries on the pass-book: by both of which, and other evidence, it appears that, with the exception of the first item of $120 in gold, all the others were of deposits with it, or payments made to it for plaintiffs, in Confederate currency. This was indicated also, and understood to be indicated, by the letter "C," written in the lines with those items, as a part of the same. No demand was made for any payment, until a considerable time after the war was ended in the overthrow of the Confederate government; and it is not proved, or pretended, that this currency then had any value.

The circuit judge charged the jury, that "money" consisted (1st) of the coin issued or circulated under the laws of the United States; (2d) of bank-notes payable and redeemable in such coin; and (3d) of the paper commonly called "greenbacks", and the notes issued under the laws of the United States commonly called "national-bank notes." "In this definition," he added, "I do not include the notes issued by the Confederate States during the late war, nor the notes of banks that had suspended specie payments during such suspension. Such might be circulated, as a medium of commercial transactions, but were not money." And he, in effect, charged the jury that, unless defendant had admitted itself indebted in money, as thus described, or beyond the extent to which it had done so; or unless it had received money, or beyond the amount to which it had received *money*, as thus defined,—it was not liable to plaintiffs, according to the terms of the complaint they had filed in this cause. These instructions were excepted to, and counter charges, intended to obviate the effect of them, were offered, which the judge refused to give; to which, also, the plaintiffs excepted. A verdict for $500, including the sum of $120 in gold, was rendered in favor of plaintiffs; which they being dissatisfied with, appealed from, to this court.

3. The view we take of the case makes it unnecessary to discuss in detail the various propositions which have been pre-

sented by counsel for appellants. They are answered, or obviated, by the conclusion we have reached, conforming to that of the Supreme Court of the United States in *Planters' Bank of Tennessee v. Union Bank of Louisiana*, 16 Wallace, 483. During the war, the former institution forwarded to the latter, among other things, drafts and claims for collection, and a few Confederate bonds for sale; it being understood between the two, that the drafts and claims thus forwarded were payable only in Confederate currency, and that the same might be received for the bonds to be sold. Some time afterwards, in the year 1863, while this currency still had value, a demand was made by the Planters' Bank, on the Union Bank, for payment of the large sum that should be on its books to the credit of the former. But, owing to the interference of General Banks, commander of the forces of the United States then in New Orleans, payment was refused; and a suit was, in consequence, brought after the war, in a court of the United States, by the Planters' Bank against the Union Bank. At the trial, the plaintiff bank asked, among other charges, that the following should be given to the jury: "If the jury should find, from the evidence, that the defendants received Confederate currency on behalf of the plaintiffs, and entered it to the credit of the plaintiffs, on the books of the bank, and used it in their general business, the defendants thereby became the debtors of the plaintiffs; and that the measure of the indebtedness was the value of the Confederate currency, in the lawful money of the United States, at the time the credits were entered and the collections made." This instruction the court refused to give, but it charged the jury, "that the measure of indebtedness for receipts or collections made by the defendants in Confederate currency, and used by them in their general business, was the value of such currency at the date of demand of payment made by plaintiffs, and not at the date when such currency was received and used by the defendants in their business."

The Supreme Court held, that this instruction was correct. "We do not," says the opinion, "controvert the position, that generally a bank becomes a debtor to its depositor, by its receipt of money deposited by him, and that money paid into a bank ceases to be the money of the depositor, and becomes the money of the bank, which it may use, returning an equivalent, when demanded, by paying a similar sum to that deposited. So, also, a collecting bank ordinarily becomes the owner of money collected by it for its correspondent, and, consequently, a debtor for the amount collected, under obligation to pay on demand, not the identical money received, but a sum equal in legal value. But, it is to be observed,

[Henry & Co. v. Northern Bank of Alabama.]

this is the rule where money has been deposited or collected, and when there has been no contract or understanding that a different rule should prevail. . . . The Union Bank became the agent of plaintiff, to receive and collect, not money, but Confederate notes or promises; and the obligation it assumed was to pay Confederate notes, when they should be demanded. . . . From the nature of the transaction, it is to be inferred, that the intent of the parties was, that the one should impose, and the other assume, only a liability to return to the plaintiffs notes of the Confederate government like those received or collected; notes promising to pay a like sum."

There was no dissent from these views on the part of any of the judges. Having regard to the times and circumstances; remembering that the regular government was expelled, and kept expelled, by another of paramount force, by which "the Confederate notes were issued early in the war, . . . and became almost exclusively the currency of the insurgent States; . . . and, while the war lasted, had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people" (*Thorington v. Smyth*, 8 Wallace, 1); a contrary doctrine, one applicable enough in ordinary peaceful times, would be, in the highest degree, unreasonable and unjust. And so entirely do the views of the Supreme Court correspond with the general understanding of the people of these States, that, as is shown by the evidence in this cause, plaintiffs are the only persons of the numerous customers and creditors of the defendant bank, who became such in the same manner, and during the same period, and were such at the close of the war, that have insisted it should now make good losses of value produced by irresistible political causes operating upon the currency which only they were entitled to, and upon that of every other person alike.

4. It results from what we have said, and from the fact that, when demand was made by plaintiffs of defendant, Confederate currency had no pecuniary value whatever, that the judgment they obtained included all they were entitled to recover from the defendant. No benefit can accrue to them in this cause, by a decision of the other questions that have been presented, and we, therefore, refrain from discussing them. Let the judgment of the Circuit Court be affirmed.

BRICKELL, C. J., not sitting.

NOTE BY REPORTER.—On a subsequent day of the term, the following opinion was delivered:

STONE, J.—The uses of banks and banking institutions, in the commerce of the world, are too well known to require discussion. They furnish, without compensation, and without direct profit, a safe and convenient depository of the moneys of the public, not wanted for present use or disbursement. Their safes and strong vaults, for the safe custody of valuables, are preferred to the most watchful supervision and protection the most prudent man can exercise or bestow. So well known has this fact become, that trustees may deposit trust funds in banks of good standing; and if they do so, any loss resulting therefrom will be regarded as the loss of the beneficiary, provided the deposit is made to the credit of the trust account.—Story's Eq. Ju. §§ 1269 et seq.

The war between the sections, commencing in 1861, produced, in many respects, a state of things rarely met with in the history of the world. The several States composing the Union had theretofore existed under one common, recognized head. To the extent of the powers conferred on the Federal government, we were one government. Our lawful money, and money standard, were one; and, as a rule, money current in one State, was current in all the others. Commercial dealings between the several States were very large, and remittances from one section to another were mainly conducted through banks. Coin had alone been declared a legal tender, and the expense and inconvenience of its transmission had forced it to give place to the less expensive, less hazardous method, of remitting in bank exchange. The war changed all this. The States which attempted to set up a separate government, under the name of the Confederate States of America, must necessarily provide a currency for themselves. A colossal war ensued, which raged for four years. All great wars are fought on credit; and the seceding States, having at the beginning no exchequer, must, of necessity, rely on its bills of credit, to procure the sinews of war. Treasury-notes of the Confederate States were issued in immense volume, and very soon became the sole circulating medium within the Southern lines. Being issued, as they were, on the faith of a government whose existence was denied and resisted, and could only be maintained by the termination of the struggle successfully to the arms of the South, the value of such treasury-notes was, of course, contingent. Still, being the only circulating medium we had, they served the purposes of money. They purchased and paid for property of every description, were received in payment and discharge of debts, and, while they had life, answered all the purposes of money. They even discharged trust obligations, when received in good faith; and, when that cur-

[Henry & Co. v. Northern Bank of Alabama.]

rency perished in the hands of the trustee, for want of an opportunity to invest, or otherwise dispose of it, if there was no evidence of bad faith in the trustee, we have held that the debt is discharged, the trustee relieved of legal liability, and that the loss falls on the beneficiary.—*High v. Snedicor*, 57 Ala. 401 ; *Horn v. Lockhart*, 17 Wall. 570 ; *Waring v. Lewis*, 53 Ala. 615 ; *Baldwin v. Hatchett*, 56 Ala. 561 ; *Hutchinson v. Owen*, 59 Ala. 326 ; *Van Hoose v. Bush*, 54 Ala. 342.

During the war, banks, located in the Confederate States, were compelled to receive and pay out Confederate treasury-notes, or do no business whatever. The volume of such notes in circulation was very large—increased by the heavy depreciation they were constantly subjected to. Having so little purchasing power, it became necessary to make up in quantity what was wanting in value. A large per cent. of this immense volume of Confederate treasury-notes, amounting to hundreds of millions of dollars in nominal value, was passing in and out of the banks ; and it is safe to conjecture that, at no time during the closing years of the war, was there less than hundreds of millions of this currency in the vaults of the various banks. At the close of the war, by the surrender of the Southern armies, the Confederate States, as a separate government, ceased to exist, and the immense volume of its circulation became valueless.

The rule is clearly settled, that in the ordinary transactions of banks, when they receive moneys on general deposit, the money thereby becomes the property of the bank, and the bank becomes debtor to the depositor for the amount, as so much money had and received ; and any subsequent loss of the money, or destruction of its value, falls on the bank. The depositor is only a creditor ; and if the bank fail, and be unable to pay its debts in full, he comes in only as a general creditor, and must be content to receive his *pro rata* of the assets. This, we say, is the general rule. But, as we have said, our war was attended with uncommon results. Its end in our overthrow left us where we were before the attempted separation ; citizens, and part and parcel of the same government, against whose authority we had fought in deadly conflict. For four years we had denied the authority of the United States government to control us in any respect—had denied that we were under the provisions of the constitution of the United States ; and the Confederate treasury-notes were issued, and put in circulation, to aid us in vindicating our claim of separate governmental existence. Being conquered, we were remitted to our allegiance to the government of the United States ; and the question naturally came up, in what light must contracts and transactions be

viewed, which were based on Confederate treasury-notes as a currency. They had been issued in hostility to the government of the United States, and must be passed on by courts of the United States, or State courts acknowledging allegiance to the constitution of the United States. It was contended that, inasmuch as this currency was issued to aid in the overthrow of Federal authority in the seceding States, it was against public policy to uphold any transaction based upon it. Wiser counsels prevailed, and the courts adopted conservative rules, which, while they vindicated the dignity and rightful authority of the Federal government, abstained from declaring void any contract or transaction which did not, in its direct aims and results, antagonize that authority. The issue of such currency, they held, was unlawful, because it was aimed against the Federal authority. Being in circulation, however, and the only circulating medium the people had, or could have, they were forced to its use by the presence and power of an organized force, having and exercising the powers and functions of government, and they were left without option in the premises.

Confederate treasury-notes must be used, or the people were left without money, or any thing to take its place. So, contracts between individuals, based on that currency, and having in them no element of aid to the Confederate struggle, whether executed or executory, were not held invalid on that account.—*Thorington v. Smyth*, 8 Wall. 1; *Horn v. Lockhart*, 17 Wall. 570. "The existence of a state of insurrection and war did not lessen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prevented, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated, precisely as in time of peace."

Ours was a peculiar form of government, and the struggle and attempted separation raised questions somewhat novel. We had, and have, a Federal government, supreme, sovereign, and paramount, in all powers and governmental functions conferred upon it. All other powers of government, and they were many, were reserved to the States respectively, or to the people. Each was sovereign, within its appointed sphere. The object of secession was to renounce and throw off the Federal power, and only the Federal power. The power, jurisdiction, and autonomy of the seceding States, were not attempted to be changed. These were to be exercised as theretofore, with the single exception that they sought to establish a confederated union among and within themselves, independent of the larger and more comprehen-

[Henry & Co. v. Northern Bank of Alabama.]

sive union from which they attempted to secede. This being the case, it would seem that all legitimate acts of State authority and government, done in preservation of life, liberty and property, contributing to individual comfort and happiness, and relieving social wants and social necessities, should be upheld, so long as they rendered no aid to the attempt to establish a separate government; and such we understand to be the weight of the judicial rulings on this troublesome question.

But, in carrying out this principle, many vexing questions arose, and continue to arise. In theory, and in fact, we have all the while been under the power and restraint of the constitution of the United States. Such is the legal sequence of the result of the war. Contracts for the payment of money, expressed as so many dollars, were frequently entered into during the war, fixing a time of payment which fell due after the downfall of the Confederacy. Dollars have a defined value under the constitution and laws of the United States. Treating such contract as one for the payment of money, and treating the parties as governed by the constitution and laws of the United States, the promissor would be held to pay the given sum in current, legal money of the United States. But, when it was shown that the contracting parties were domiciled in the section controlled by Confederate authority, where only Confederate currency circulated, the presumption arose, at once, that the parties did not probably contract in reference to dollars of the United States currency; and that presumption was made conclusive, when it was shown that the price promised, if exacted in the lawful money of the United States, would be, perhaps, tenfold the actual value of the property purchased. Hence, courts were compelled to hold, what was in fact the case, that the contract was made in reference to Confederate currency, and that the price agreed on was a Confederate valuation. But, from any legal stand-point, courts, recognizing the authority of the United States government, could take, Confederate treasury-notes were not money; and if money, they were a greatly depreciated currency. They were, then, either a depreciated money, or they were not money, but a commodity or chattel. Considered as depreciated money, the promise was to pay so much depreciated, or uncurrent money. For a breach of such promise, the measure of recovery is the value, in lawful money, of the uncurrent money at the time of the breach. The measure of recovery is the same, on the breach of a contract to pay specific chattels.—*Moore v. Fleming*, 34 Ala. 491; 22 Ala. 512; *Bozeman v. Rose*, 40 Ala. 212; *McGehee v. Posey*, 42 Ala. 330. But,

(35)

[Henry & Co. v. Northern Bank of Alabama.]

at the time of the breach, the currency or chattel (Confederate treasury-notes) had ceased to have any value, actual or conventional. Applying the rules above, there could be no recovery for the breach of such a contract. The courts established, as the measure of recovery in such case, the value of the property which was the consideration of the promise; thus ignoring the express stipulations of the contract, and treating it as an implied one.—*Herbert v. Easton*, 43 Ala. 547; *Riddle v. Hill*, 51 Ala. 224; *Erwin v. Hill, Ib.* 580; *Whitfield v. Riddle*, 52 Ala. 467; *Thorington v. Smyth*, 8 Wall. 1; *Stewart v. Soloman*, 4 Otto, 434; *Hill v. Erwin*, 60 Ala. 341. This ruling can not be reconciled with principles long established, but it was considered a necessity, to prevent gross injustice. Other rulings, growing out of the war, have been equally a departure from principle, but we will not enlarge this opinion by stating them. The cases of *Myers v. Zetelle* (21 Grat. 733), and *Ferguson v. Lowery* (54 Ala. 510), are strong and eloquent arguments in favor of generous, liberal rulings, in all cases where the results of our civil war, viewed *a posteriori*, have entailed a seeming liability on agents and trustees.

We have dwelt so much at length on these principles, not because they bear directly on the question before us, but because they demonstrate that well-settled principles of law, applicable to society in its normal conditions, must be departed from, when their enforcement would lead necessarily to a great and general evil. We have said that, at the downfall of the Confederacy, there had accumulated in the banks, in the natural course of dealings, perhaps hundreds of millions in Confederate currency, deposited and not drawn out. When the flag of the Confederacy went down, to be unfurled no more, that vast volume of a circulating medium became waste paper, representing nothing. A deposit in bank, while, as a general rule, it is attended with the incidents pointed out above, is nevertheless a peculiar species of contract. It is not like an ordinary 'bill receivable,' but is classed as the depositor's cash on hand. It is subject to his draft and control at any moment, and he is not expected to give notice of his intention to draw. The bank is expected to be at all times ready to meet its customers' cheques, drawn on deposits, and its credit is seriously impaired, if not ruined, if it fail to do so. It does not stand in the category of an ordinary debt between man and man, for money had and received. These considerations, if the question were for the first time presented, would cause us to hesitate long before declaring the bank liable for a deposit which thus perished on its hands. We are glad the way has been blazed

[Blackman v. Lehman, Durr & Co.]

out for us by that distinguished tribunal, the Supreme Court of the United States. We cheerfully follow the decision in *Planters' Bank of Tennessee v. Union Bank of Louisiana*, 16 Wall. 483, because, in our opinion, it leads to a wholesome and just result.